THE VILLAGE OF OAK PARK, Plaintiff-Appellant, v. THE VILLAGE OF OAK PARK FIREFIGHTERS PENSION BOARD *et al.*, Defendants-Appellees.

First District (1st Division)    No. 1—05—0316

Opinion filed November 7, 2005.

Lance C. Malina and Jacob Karaca, both of Klein, Thorpe & Jenkins, Ltd., of Chicago, for appellant.

Cary J. Collins and Robert S. Bell, both of Law Offices of Cary J. Collins, of Hoffman Estates, for appellee Village of Oak Park Firefighters Pension Board.

Jacob Pomeranz, of Cornfield & Feldman, of Chicago, for appellee Dennis Weidler.

Thomas W. Duda, of Law Offices of Thomas W. Duda, of Arlington Heights, for *amicus curiae*.

JUSTICE GORDON delivered the opinion of the court:

Dennis Weidler, a hearing-impaired Oak Park firefighter, filed an application for a duty-related disability pension. A hearing was held before five members of the nine-member Village of Oak Park Firefighters Pension Board (the Pension Board).[1] The Pension Board voted by a 3 to 2 margin to grant Weidler a duty-related disability pension. The Village of Oak Park (the Village) then successfully moved to intervene as an interested party. After the Village's motion to rescind

---

[1] One member was absent due to illness. Nothing in the record indicates why the other three members were absent.

the pension award was denied,[2] the Village petitioned for administrative review. The circuit court upheld the Pension Board's decision. For the reasons that follow, we affirm.

## BACKGROUND

The following was introduced into evidence at the hearing before the Pension Board. On January 24, 2003, the director of human resources for the Village wrote Weidler a letter, which stated, in pertinent part:

"As a result of an audiogram[3] ***, it has been determined that you are not fit to perform the essential duties and responsibilities of the position of Fire Fighter for the Village of Oak Park.

You have the right to apply for a Fire Pension Disability with the Oak Park Fire Pension Board. It is our recommendation that you apply for that disability. In the event you are denied a disability pension, it will be the Village's recommendation to the Board of Fire and Police Commission to terminate your employment as a Fire Fighter due to your medical condition and the fact that there are no reasonable accommodations that the Village can make for you in the position of Fire Fighter."

On January 28, 2003, Weidler filed an application for a duty-related disability pension. Shortly thereafter, Weidler was examined by three physicians chosen by the Pension Board, Drs. Peter Orris (on February 5, 2003), Daniel G. Samo (on February 18, 2003), and Sam J. Marzo (on March 6, 2003).

In his report, Dr. Orris noted that Weidler gave a history of hearing loss since 1992 and of using hearing aids on the job since 1998. Dr. Orris concluded that Weidler had:

"Moderate/Severe hearing loss more likely than not secondary to firefighting. Following NFPA [(National Fire Protection Association)] standards, Mr. Weidler is unfit to return to active firefighting. He may perform other duties if the department can accommodate him."

Dr. Orris certified Weidler as permanently disabled from firefighter service.

Dr. Samo, like Dr. Orris, noted in his report that Weidler's hearing problem dated back to 1992, and in 1998 Weidler began using hearing aids. Dr. Samo additionally noted that at the time of the examination Weidler used hearing aids in both ears. According to Dr. Samo, a review of Weidler's medical records showed that his hearing deficit was "not typical for aging or noise-induced loss." Dr. Samo assessed Weidler's condition as follows:

---

[2]The motion failed in a tie 4 to 4 vote.
[3]Hearing test.

"My impression is that [firefighter] Weidler does have a neuro-sensory hearing loss. I feel this is not noise induced, but is congenital. I do not think it is related to noise exposure or to his job duties. The amount of hearing loss would be moderate."

Dr. Samo further opined that Weidler's impairment did not rise to the level of a disability:

"At this point from [Weidler's] history [his hearing loss] is not impacting his ability to do his [essential job functions]. He is well accommodated using hearing aids and with them in place has fairly normal hearing on testing. His condition would *** therefore not absolutely preclude him from being a firefighter. I do not feel at this point that he is disabled from his regular job duties as a fire-fighter."

After Dr. Samo issued his report, the Pension Board wrote to him, advising him that the Village no longer permitted its firefighters to wear hearing aids while on duty and that it had no light- or restricted-duty positions available. The record contains no response from Dr. Samo to that correspondence.

Lastly, Dr. Marzo, in his report, opined that Weidler had

"a mild to moderate mid-frequency sensorineural hearing loss which is likely genetic in nature. This hearing loss is very well-rehabilitated with hearing aids bilaterally."

Consequently, Dr. Marzo initially concluded that:

"[Weilder] is able to perform his essential duties as a firefighter without any difficulty with this mild hearing impairment."

After Dr. Marzo issued his report, he too was advised by the Pension Board that Village firefighters were no longer permitted to wear hearing aids while on duty and that the fire department had no restricted- or light-duty positions available. Dr. Marzo was also advised that the Village had determined that due to his hearing loss Weidler was not fit to perform the essential duties of a firefighter. This led Dr. Marzo to reconsider his initial opinion and certify Weidler as permanently disabled from firefighter service.

On May 23, 2003, the director of human resources for the Village wrote Weidler a memo, apparently modifying his January 24, 2003, letter:

"No final determination has been made at this time concerning your ability to perform the essential functions of the Firefighter classification with regard to your hearing. Until such a determination is made, it is not necessary for you to apply for a disability retirement."

On August 25, 2003, the director of human resources wrote a memo to the Village attorney and the Village fire chief, apparently superceding the memo of May 23, 2003. The new memo stated:

"Attached for your information is a letter from Dr. Lyman[4] of West Suburban Hospital stating that Firefighter/Paramedic Dennis Weidler does not meet the National Fire Protection Association hearing standards. For your information, the 2003 standards are now in effect."

Dr. Lyman's letter referred to in the memo indicated that he had reviewed Weidler's most recent audiogram taken on August 21, 2003. The letter further stated, in pertinent part:

"By either the 2000 or the proposed 2003 NFPA guidelines, I would not pass Mr. Weidler to perform his job as a firefighter or wearing a respirator. His hearing loss condition is permanent and he would therefore not be expected to qualify to wear a respirator and perform firefighting duties in the future."

On August 27, 2003, the Pension Board, with five of its nine members in attendance, held a hearing. The five attending members constituted a quorum. In addition to the foregoing materials, Weidler introduced into evidence: the report of decibel readings, taken on June 1, 2001, reflecting the noise levels inside the Village's fire trucks when the sirens were on; a letter, dated March 12, 2003, from an NFPA staff member to the deputy chief of the Village fire department discussing hearing loss standards and concerns about firefighters' use of hearing aids—emphasizing that hearing aids, unlike fire fighting gear, are not designed to withstand the fire fighting environment and, therefore, compromise a firefighter's ability to do his job safely; Weidler's July 10, 2002, occupational functional evaluation, which indicated that he had a disability that needed accommodation and that he could not wear a self-containing breathing apparatus (SCBA); and Weidler's audiological report prepared by a nonphysician clinical audiologist. The audiological report stated:

"The configuration shown on the audiogram from August 21, 2003 does not indicate a noise induced hearing loss. It is possible though, that a patient could have a genetic hearing loss coupled with a noise induced hearing loss. Mr. Weidler provided me with a chart of his thresholds from previous tests beginning in 1992. *** The shift from the 9/24/92 audiological exam to the 8/21/03 audiological exam in the left ear shows a configuration, which is usually associated with noise induced hearing loss. However, the configuration in the right ear may or may not indicate hearing loss associated with noise exposure ***."

The Pension Board then heard Weidler's testimony.

Weidler testified that he had been a firefighter for almost 22 years

---

[4]It appears from the record that Dr. Lyman was one of the physicians paid by the Village to examine its firefighters.

and his duties included paramedic services, rescue, fire suppression and public education. His duties required him to work with fire fighting equipment and ride in fire trucks during every shift. Weidler was frequently exposed to loud noise at work in the form of fire truck sirens and horns, noises from gas-powered generators for the rescue tools, incoming emergency calls which started with a loud tone, as well as various audio alarms and communication devices built into his air mask. He had not been exposed to loud noise outside of his employment with the fire department. Weidler was first diagnosed with hearing loss in 1992 and started to wear hearing aids in 1998. His hearing was worse in his left ear. In 1998, after getting the hearings aids, Weidler began to wear noise protection headphones over his hearing aids to reduce his exposure to on-the-job noise. At some point, Weidler had filed a worker's compensation claim concerning his hearing loss which was settled in 2001. Since the July 10, 2002, functional evaluation he has been on restricted (light) duty.

On cross-examination, Weidler admitted that there was a history of hearing loss in his family. His father, who was a firefighter for over 20 years, wore hearing aids. Weidler's paternal grandfather, who worked with heavy equipment, also sustained hearing loss. Weidler's sister had hearing problems which did not improve with surgery.

After Weidler's testimony, the Pension Board voted on whether sufficient evidence was presented to award him a duty-related disability pension. As noted, three of its members, constituting the majority of the members present, voted to award Weidler a line-of-duty disability pension. At that point, one of the dissenters, who was also an attorney for the Village, contended that a pension award is something that must be approved by the majority of the board, rather than the majority of the quorum. The Pension Board's attorney responded that although he believed that the majority of the quorum was sufficient, the board would research that issue and reconvene if the majority of all of its members was needed to approve Weidler's pension.

On October 16, 2003, the Village moved to intervene as an interested party so that it could appeal the Pension Board's determination. Among the grounds urged for the intervention was that the approval of the pension award was not made by a majority of the entire Pension Board.

While that motion was pending, on November 19, 2003, the three-member majority of the quorum (hereinafter referred to as the majority), purporting to speak on behalf of the Pension Board, issued a written decision and order awarding Weidler a duty-related disability pension. The majority opinion explained that it relied on the reports of Drs. Orris and Marzo, who certified that Weidler was disabled. The

majority believed that Dr. Samo's opinion to the contrary was controverted by the NFPA guidelines for 2003, the letter from NFPA staff member indicating that the use of a hearing aid would compromise a firefighter's ability to perform "hearing tasks," and the Village's January 2003 letter where the Village indicated that it found Weidler unable to perform his duties. The majority further found that Weidler presented sufficient evidence that his hearing loss occurred as a result of cumulative effects of acts of duty. Although it acknowledged that there was evidence that Weidler's hearing loss may have been hereditary, the majority found that, even if it was hereditary, Weidler's hearing loss was exacerbated by the exposure to fire fighting equipment and sirens. Lastly, the majority rejected the argument that the majority of all board members was required to approve a disability pension. In support, the majority relied upon, among other things, an advisory opinion issued upon the board's request by the Public Pension Division of the Illinois Department of Insurance—a regulatory body of the pension boards. The advisory opinion stated that a firefighters' pension fund board can approve a disability pension by a majority of the quorum.

The Pension Board's dissenters found that Weidler's hearing loss was purely hereditary and unrelated to any fire fighting duties. However, neither dissenter discussed whether Weidler was, in any event, disabled and would therefore qualify for a nonduty disability pension.

On December 12, 2003, the Village moved to rescind the Pension Board's decision and order on the sole ground that it violated the Illinois Open Meetings Act (5 ILCS 120/1 *et seq.* (West 2002)). The Village alleged that no meeting was held in connection with the signing of the decision and order. A hearing on this motion, as well as the Village's motion to intervene, was held on December 19, 2003, before eight members of the Pension Board. The Pension Board granted the motion to intervene. The motion to rescind, however, failed as a result of the tied 4 to 4 vote.

On December 23, 2003, the Village filed a petition for administrative review. The Village argued that the pension award was invalid on three alternative grounds: the majority of the entire membership of the board did not approve the award; none of the physicians chosen by the board certified that Weidler's disability was linked to his performance of duty; and the determination that Weidler's hearing loss was duty-related was against the manifest weight of the evidence. On January 13, 2005, the circuit court affirmed the Pension Board's decision. This appeal was timely filed on February 4, 2005. We granted Associated Fire Fighters of Illinois (AFFI) leave to file an *amicus curiae* brief.

## ANALYSIS

The Village raises the same arguments on appeal as it did before the circuit court.

■ On appeal, we review the administrative agency's decision and not the circuit court's determination. *Anderson v. Department of Professional Regulation*, 348 Ill. App. 3d 554, 560 (2004). Judicial review of a decision of the Pension Board is governed by the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 2002)). 40 ILCS 5/4—139 (West 2002). "The applicable standard of review, which determines the degree of deference given to the agency's decision, depends upon whether the question presented is one of fact, one of law, or a mixed question of law and fact." *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001). The factual findings of the administrative agency are considered to be *prima facie* correct and will be reversed only if against the manifest weight of the evidence. 735 ILCS 5/3—110 (West 2002); *Antonelli v. Board of Trustees of the Hillside Police Pension Board*, 287 Ill. App. 3d 348, 353 (1997). On the other hand, pure questions of law are reviewed *de novo. MacDonald v. Board of Trustees of the Park Ridge Police Pension Fund*, 294 Ill. App. 3d 379, 382 (1998). Lastly, mixed questions of law and fact are reviewed under the clearly erroneous standard. See *AFM Messenger Service*, 198 Ill. 2d at 391-95.

■ The Village's first contention is that the August 27, 2003, vote by the Pension Board was insufficient, as a matter of law, to award Weidler a disability pension because only three of its nine members voted in Weidler's favor. The Pension Board responds that this issue is not properly preserved for review because the Village failed to raise it in the posthearing motion to rescind and did not orally argue it after being granted leave to intervene. We disagree. While the board is correct that the Village did not raise the voting issue in its motion to rescind, the Village did raise it in its motion to intervene, which was ruled upon during the December 19, 2003, hearing—the same hearing that decided the motion to rescind. Moreover, the report of the proceedings reflects that the board, in fact, discussed the voting issue. The Village's motion to intervene implicated the question of timeliness, *i.e.*, whether the motion was brought within 35 days of the board's final decision. In that context, one board member noted that given the advisory opinion from the Illinois Department of Insurance—that the majority of the quorum may approve a disability pension—the board's decision was valid. Later in the proceedings, the dissenter who raised the voting issue during the August hearing expressed the view that the board, in addition to the advisory opinion, should have looked to the legislative history of the statutory provision addressing the award

of firefighters' disability pension (40 ILCS 5/4—112 (West 2002)) and other comparable statutory provisions. The Village subsequently articulated that position before the circuit court. Thus, it is fair to say that the voting issue was sufficiently raised to preserve it for review. See *Sylvester v. Chicago Park District*, 179 Ill. 2d 500, 507 (1997) (points raised on appeal must be commensurate with issues presented at trial). We must, therefore, address the Village's contention on its merits.

■ Section 4—112 of Article 4: Firefighters' Pension Fund—Municipalities 500,000 and Under, of the Illinois Pension Code (the Pension Code), provides that "[a] disability pension shall not be paid until disability has been established by the board." 40 ILCS 5/4—112 (West 2002). The Village argues that this language is ambiguous as to whether it requires a majority of the entire board or merely a majority of the members in attendance, so long as there is a quorum. The Village, consequently, urges that we look to analogous Illinois pension provisions to ascertain the legislative intent. The Village cites to a number of such provisions—General Assembly Retirement System, requiring no fewer than four out of seven votes for any action (40 ILCS 5/2—129 (West 2002)); Police Pension Fund—Municipalities 500,000 and Under, requiring approval "by a majority of the board members" (40 ILCS 5/3—134 (West 2002)); Policemen's Annuity and Benefit Fund—Cities Over 500,000, requiring approval "by a vote of the majority of the members of the board as shown by roll call entered upon the official record of proceedings of the meeting at which such action is taken" (40 ILCS 5/5—182 (West 2002)); Firemen's Annuity and Benefit Fund—Cities Over 500,000, requiring approval "by the affirmative vote of a majority of the total membership of the board as shown by roll call entered upon the official record of proceedings of the meeting at which such action is taken" (40 ILCS 5/6—178 (West 2002)); Municipal Employees', Officers', and Officials' Annuity and Benefit Fund—Cities Over 500,000 Inhabitants, requiring approval "by a vote of a majority of the board members" (40 ILCS 5/8—196 (West 2002)); County Employees' and Officers' Annuity and Benefit Fund—Counties Over 500,000 Inhabitants, requiring approval "by a vote of the majority of the board members as shown by roll call entered upon the official record of the meeting" (40 ILCS 5/9—189 (West 2002)); Laborers' and Retirement Board Employees' Annuity and Benefit Fund—Cities Over 500,000 Inhabitants, requiring approval "by a vote of a majority of the board members as shown by roll call entered upon the official record of the meeting" (40 ILCS 5/11—185 (West 2002)); and Metropolitan Water Reclamation District Retirement Fund, requiring approval "by a vote of a majority of the [b]oard

members, as shown by roll call entered upon the official record of the meeting at which such action is taken" (40 ILCS 5/13—705 (West 2002)). The Village additionally cites to section 3.1—40—40 of the Illinois Municipal Code (65 ILCS 5/3.1—40—40 (West 2002)), which governs city council voting and requires, in pertinent part, that all monetary expenditures be approved by a majority of all council members.

The Pension Board and the AFFI argue that the statutory provision at issue is not ambiguous and therefore it would not be proper to engraft onto it other conditions which the legislature did not provide for. They further argue that, in the absence of a specific legislatively imposed voting requirement, the common law governs. Weidler joins in the latter argument and additionally points out that the common-law rule that a majority of the quorum may make binding decisions is well established and presumed to be known by the legislature. Because this is a pure question of law, we review it *de novo*.

We agree with the Village that the statutory provision at issue is ambiguous. See *In re B.L.S.*, 202 Ill. 2d 510, 517 (2002) ("'[a] statute is ambiguous when it is capable of being understood by reasonably well-informed persons in two or more different senses'"); *People ex rel. Compton v. Penn*, 33 Ill. App. 3d 372, 373 (1975) ("'[a]re these sections then to be construed as requiring unanimous action by the [board] *** or do they require only action by a majority of all [of] them or only action by a majority of those who participate in the undertaking?'"); *In re Timothy T.*, 343 Ill. App. 3d 1260, 1263 (2003) ("Both respondent and the State offer reasonable interpretations of [the statute]. We thus conclude that the statutory language is subject to more than one reasonable interpretation and is ambiguous"). Nevertheless, for the reasons discussed below, we find that the *number* of votes required for the disability to be "established by the board" within the meaning of section 4—112 is governed by common law.

A "quorum" is the number of assembled members that is necessary for a decision-making body to be legally competent to transact business. 59 Am. Jur. 2d *Parliamentary Law* § 9 (2002). Under common law, a majority of a body constitutes a quorum (59 Am. Jur. 2d *Parliamentary Law* § 9 (2002)) and, if a quorum is in attendance, a vote of a majority of those present is sufficient for valid action (*Wolkoff v. Chassin*, 89 N.Y.2d 250, 254, 675 N.E.2d 447, 448-49, 652 N.Y.S.2d 712, 713-14 (1996); *Township Committee of Township of Edgewater Park v. Edgewater Park Housing Authority*, 187 N.J. Super. 588, 597, 455 A.2d 575, 579 (1982); 59 Am. Jur. 2d *Parliamentary Law* § 9 (2002)). This common-law rule has been followed in Illinois in the absence of clear statutory expression abrogating it. See *Hickey v. Il-*

*linois Racing Board*, 287 Ill. App. 3d 100, 105 (1997) (common-law voting rule applies where the statute is silent as to the number of votes required for a valid action); *Compton*, 33 Ill. App. 3d at 373, 377 (where the statute provided that " 'the remaining members of the board *** shall fill any vacancies [on the board] *** by appointment,' " "[i]f a quorum had been present, a majority of those present could have acted to make the appointment"); 1980 Ill. Att'y Gen. Op. 121 ("[a] majority of the quorum present at a meeting of the Illinois Energy Resources Commission may approve or reject proposed projects"); 1979 Ill. Att'y Gen. Op. 102 (as long as a quorum of the Illinois Racing Board was present, the number of the required votes is the majority of the members present). Additionally, as the AFFI points out, the advisory opinion in this matter of the Illinois Department of Insurance, which also follows the common-law rule, although not binding on this court, may be given persuasive weight. See *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d 142, 152-54 (1983).

■ The Village, however, urges for a statutory interpretation that is in derogation of the common law. Although the ambiguous language of section 4—112 would leave room for the interpretation urged by the Village,

> "a court cannot construe a statute in derogation of the common law beyond what the words of the statute express or beyond what is necessarily implied from what is expressed. In construing statutes in derogation of the common law, a court will not presume that an innovation thereon was intended further than the innovation which the statute specifies or clearly implies. [Citations.] Illinois courts have limited all manner of statutes in derogation of the common law to their express language, in order to affect the least—rather than the most—change in the common law." *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 69 (2004).

As the Pension Board, the AFFI and Weidler correctly assert, no intent to depart from the common-law "majority of the members present" rule is expressed or indicated by the words of section 4—112 "established by the board." Accordingly, we will not read any such requirement into section 4—112 by intendment or implication. See *In re Illinois Bell Switching Station Litigation*, 161 Ill. 2d 233, 240 (1994). Moreover, the analogous Illinois pension provisions cited to by the Village undercut its very position. Those "analogous" pension provisions demonstrate that, when it so chooses, the legislature knows how to articulate a requirement that a pension be approved by a majority of the board's total membership (see 40 ILCS 5/6—178 (West 2002) (requiring approval of "the total membership of the board")). Consequently, where as here the legislature does not spell out that

requirement, it would indicate that the legislature did not intend to impose such a requirement. See *Metzger v. DaRosa*, 209 Ill. 2d 30, 44 (2004); *Mobil Oil Corp. v. Industrial Comm'n*, 327 Ill. App. 3d 778, 791 (2002). In addition, we note that several of the analogous statutory provisions relied upon by the Village do not, in fact, unequivocally require approval by a majority of *all* board members. As noted, sections 3—134, 5—182, 8—196, 9—189, 11—185 and 13—705 require approval by a majority of the "members of the board" or "board members." They reasonably lend themselves to the common-law "majority of the members present" interpretation, as well as the "majority of all members" interpretation urged by the Village. In this regard, we note that "the purpose of laws for police and firemen's pensions is beneficial and such statutes should be liberally construed in favor of those to be benefitted." *Jahn v. City of Woodstock*, 99 Ill. App. 3d 206, 208 (1981). In light of all of the foregoing, we find that the Pension Board's 3 to 2 vote is sufficient, as a matter of law, to award a disability pension.

■ The Village next contends that, as a matter of law, Weidler was not entitled to a disability pension because his line-of-duty disability was not confirmed by the three physicians selected by the Pension Board. We disagree. Again, our review of this question of law is *de novo*. The Village misreads section 4—112, which provides, in pertinent part:

> "A disability pension shall not be paid until disability has been established by the board by examinations of the firefighter at pension fund expense by 3 physicians selected by the board and such other evidence as the board deems necessary." 40 ILCS 5/4—112 (West 2002).

Contrary to the Village's assertion, the plain language of the statute requires neither a concurrence of the three physicians that a firefighter is disabled, nor does it even require an opinion of one physician, let alone a concurrence of all three, that his disability is duty-related. Section 4—112 applies to both line-of-duty and nonduty disability pensions and, as the Pension Board correctly states, requires that three physicians selected by the board examine the firefighter and report their findings to the board. Here, the Village does not dispute that three physicians had examined Weidler and submitted their reports to the Pension Board. Section 4—112 requires no more.

The Village, nevertheless, argues that section 4—112 should be interpreted to contain the same requirements as its Article 6 of the Pension Code counterpart, section 6—153, which is part of Firemen's Annuity and Benefit Fund—Cities Over 500,000. Section 6—153 provides, in pertinent part:

"Proof of duty, occupational disease, or ordinary disability shall be furnished to the Board by *at least one* licensed and practicing physician appointed by the Board. In cases where the Board requires the applicant to obtain a second opinion, the applicant may select a physician from a list *** established and maintained by the Board. The Board may require other evidence of disability." (Emphasis added.) 40 ILCS 5/6—153 (West 2002).

The Village's reliance on section 6—153 is misplaced. This section does little more than illustrate the lack of uniformity among the various articles comprising the Pension Code. However, there is no requirement in Article 4, which controls here, that an examining physician furnish proof of duty-related disability to the board. It would be improper for this court to engraft such a requirement onto Article 4. See *People ex rel. Devine v. $30,700.00 United States Currency*, 199 Ill. 2d 142, 150-51 (2002) ("[w]here clear and unambiguous, statutory language must be enforced as enacted, and a court may not depart from its plain language by reading into it exceptions, limitations, or conditions not expressed by the legislature"); *Droste v. Kerner*, 34 Ill. 2d 495, 504 (1966) ("[w]e will not and cannot inject provisions not found in a statute, however desirable or beneficial they may be"). Furthermore, even if we were to agree with the Village on this point, we would, in any event, find Weidler in compliance with the requirement that an examining physician furnish proof of duty-related disability since, as noted, Dr. Orris submitted his opinion to that effect to the board.

■ The Village finally contends that the Pension Board's finding that Weidler's disability is duty-related was against the manifest weight of the evidence. The Village maintains that the evidence shows that Weidler's hearing loss was congenital. The Pension Board, the AFFI and Weidler argue that there was sufficient competent evidence for the Pension Board to conclude that Weidler's hearing loss, even if congenital in origin, was exacerbated by the noise he was subjected to in the course of performing his job duties.

As noted, the board considered the evidence of Weidler's disability in light of the 2003 NFPA standards addressing a firefighter's essential job functions. In doing so, it necessarily had to both construe the NFPA standards and weigh the evidence. Such mixed question of law and fact is reviewed under the clearly erroneous standard. See *AFM Messenger Service*, 198 Ill. 2d at 391-95; *Knight v. Village of Bartlett*, 338 Ill. App. 3d 892, 898 (2003) (the question of the police officer's eligibility for a disability pension presents a mixed question of law and fact and is reviewed under the clearly erroneous standard). The clearly erroneous standard of review is "between a manifest

weight of the evidence standard and a *de novo* standard so as to provide some deference to the [agency's] experience and expertise." *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). Although we must afford deference to the agency's experience and expertise, we will reverse its decision " 'when although there is evidence to support it, [we are] *** left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service*, 198 Ill. 2d at 393, quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 92 L. Ed. 746, 766, 68 S. Ct. 525, 542 (1948). However, whether Weidler's disability was duty-related is a pure question of fact and, therefore, subject to the manifest weight of the evidence standard of review. See *City of Belvidere*, 181 Ill. 2d at 205.

Section 4—110 provides, in pertinent part:

"Disabililty pension—Line of duty. If a firefighter, as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty or *from the cumulative effects of acts of duty*, is found, pursuant to Section 4—112, to be physically *** permanently disabled for service in the fire department, so as to render necessary his or her being placed on disability pension, the firefighter shall be entitled to a disability pension ***." (Emphasis added.) 40 ILCS 5/4—110 (West 2002).

There is no requirement that the applicant's job duties be the sole or primary cause of his disability; rather, it is sufficient that the duty-related activities were a contributing or exacerbating factor. See *Luchesi v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 333 Ill. App. 3d 543, 550 (2002); *Scalise v. Board of Trustees of the Westchester Firemen's Pension Fund*, 264 Ill. App. 3d 1029, 1033 (1993); *Kellan v. Board of Trustees of the Firemen's Pension Fund*, 194 Ill. App. 3d 573, 582 (1990). The burden of proof is on the applicant. *Ernzen v. Board of Trustees of the Batavia Firemen's Pension Fund*, 96 Ill. App. 3d 1143, 1148 (1981).

The Village does not dispute that Weidler suffers from a hearing loss. Rather, the Village argues that Weidler failed to provide sufficient competent evidence to link his hearing loss to his employment as a firefighter. More specifically, the Village contends that Dr. Orris's opinion as to the cause of Weidler's hearing loss is not "solid evidence" and the remaining evidence in Weidler's favor—*i.e.*, his testimony, the audiologist's report, the audiograms, and the noise-level readings from the Village's fire trucks—does not provide competent support.

As a preliminary matter, we uphold, as not clearly erroneous, the Pension Board's finding that Weidler is disabled. Two of the three examining physicians concluded that Weidler was disabled. Moreover,

Dr. Lyman, the physician retained by the Village to examine its firefighters, concluded that Weidler's hearing loss rendered him unable to perform a firefighter's duties.

The examining physicians disagreed as to the cause of Weidler's hearing loss. As noted, Drs. Samo and Marzo opined that Weidler's hearing loss was likely genetic in nature. On the other hand, Dr. Orris opined that Weidler's hearing loss was "more likely than not secondary to firefighting." The Village argues that the language in Dr. Orris's report is not sufficiently conclusive to provide solid evidence required of an applicant to meet his burden of proof, especially where the examining physician is not present at the hearing to explain what he meant by the term "secondary to." We disagree. The language at issue is neither ambiguous nor vague. The term "secondary to" is a medical term of art, meaning "caused by." See Webster's Third New International Dictionary 2050 (1993) ("secondary" means "immediately derived from something original, primary, or basic"; "of, relating to"). Moreover, it was permissible for Dr. Orris to express his opinion in terms of probability rather than reasonable certainty. See *McKenzie v. SK Hand Tool Corp.*, 272 Ill. App. 3d 1, 8-10 (1995) (it is reversible error to exclude a medical opinion stated in terms of probability or possibility as incompetent evidence). We further note that while there was disagreement among the experts, the Pension Board did not have to accept the majority view. See *Brewer v. Custom Builders Corp.*, 42 Ill. App. 3d 668, 677 (1976) (expert testimony, like other testimony, is to be weighed by the trier of fact).

With respect to the audiologist's report and the audiograms, the Village urges that we may not consider those upon review because they were admitted into evidence without proper foundation or testimony from the authors to explain their import and, consequently, could not be regarded as anything more than conjecture. The Village further points out that the board, in rendering its decision, did not, in fact, purport to place any reliance upon these materials. While there may be some merit to the Village's challenge to the admissibility and weight to be assigned to these materials, it would not be outcome-determinative since the remaining evidence which the board did purport to consider is sufficient to sustain its decision.

Weidler testified to his on-the-job noise exposure over the course of nearly 22 years and that he began to develop hearing problems after 10 years of working as a firefighter. The Village argues that Weidler's "self-serving" testimony is not competent evidence. We disagree that Weidler's testimony was inadmissible. There is no rule precluding admissibility of an applicant's testimony on the grounds that it is self-serving. If anything, this factor would only impact upon its weight and not its admissibility.

The Village also argues that the noise-level readings from the Village's fire trucks taken some three years prior to the hearing were irrelevant and incompetent evidence. We disagree. Such evidence of exposure to loud noises is directly relevant to Weidler's claim that the noise levels to which he was exposed were duty-related.

The Village finally asserts that the pattern of hearing loss in Weidler's family precludes a finding that his hearing loss was duty-related. However, the only hearing-impaired member of Weidler's family who was not exposed to loud noises at work was his sister. Weidler's father's and grandfather's hearing loss coincided with their employment in noisy settings. It was up to the Pension Board to take all that evidence into consideration in making a determination of whether Weidler's hearing loss was caused or exacerbated by his noise exposure on the job.

In sum, although the evidence of the cause of hearing loss considered by the Pension Board may not be overwhelmingly in Weidler's favor, it is fully sufficient to support the board's determination. It is not this court's function to reweigh the evidence. *Scalise*, 264 Ill. App. 3d at 1033. "If the record contains evidence to support the agency's decision, it should be affirmed." *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). We cannot say that the Pension Board's determination that Weidler's disability was duty-related was unsupported by competent evidence and reasonable inferences that could be drawn therefrom. Dr. Orris's opinion that Weidler's hearing loss was "more likely than not secondary to firefighting," together with the evidence of Weidler's frequent on-the-job exposure to loud noise, is sufficient to sustain the Pension Board's decision.

For the reasons set forth above, we affirm the Pension Board's decision to grant Weidler a duty-related disability pension.

Affirmed.

BURKE and McBRIDE, JJ., concur.