SECOND DIVISION
June 27, 2006

No. 1-05-2096

CARLISLE INVESTMENTS GROUP, LTD.,    )
GARY L. BLANK and JOHN G. FREZADOS,    )
                                             )        Appeal from the
         Plaintiffs-Appellants,      )        Circuit Court of
   v.                                 )        Cook County.
                                             )
JESSE WHITE, SECRETARY OF STATE, )
STATE OF ILLINOIS,                   )        Honorable
                                           )        Mary Ann Mason,
         Defendant-Appellee.        )        Judge Presiding.
                                           )

JUSTICE SOUTH delivered the opinion of the court:

Following an administrative hearing, the Secretary of State found that plaintiff and its officers acted as loan brokers within the meaning of the Illinois Loan Brokers Act of 1995 (Act) (815 ILCS 175/15-5.15 (West 1998)) when they agreed in November 1999 to arrange sources of financing for, and to help rehabilitate, a building owned by Lorraine Phillips in return for a fee, and that they violated sections 15-10 and 15-15 of the Act (815 ILCS 175/15-10, 15-15 (West 1998)) by not registering, or applying to register, as such. In addition, after plaintiffs failed to comply with the Secretary's subpoena, which requested that they provide monthly statements for their bank and other financial accounts from January 1, 1999, forward, and which the hearing officer found relevant over plaintiffs' objections, the Secretary found that they violated section 15-45 of the Act, which prohibits refusing to respond the Secretary's written requests for information. 815 ILCS 175/15-45 (West 2000). The Secretary then issued a permanent order prohibiting plaintiffs from acting as loan brokers and assessed fines against them: $5,000

1-05-2096

against Carlisle, and $2,500 against each of the individual plaintiffs.  The Secretary's decision was affirmed by the circuit court in a written order.  This appeal followed.

FACTUAL HISTORY

On or about November 10, 1999, Carlisle Investment Group, Ltd. (Carlisle), through its executive vice-president, John G. Frezados, entered into a consulting agreement (Agreement) as to property located at 630 S. Wabash in Chicago, with Lorraine Phillips, the owner of the property.  The  Agreement identified Carlisle as "specializing in the organization and presentation of financial packages [with] established relationships with sources of financiers," and specified the desire of Phillips to "retain and employ the services of Carlisle for the analysis and assistance in the presentation of the financial package and the necessary liaison required between and/or among vendors and financiers," which contained the following terms and provisions:

"a.  Carlisle is hereby appointed as agent and consultant of Phillips, and otherwise [to] act on a full time basis as management and financial consultant and advisor.

b.  Upon the culmination of a financing agreement by and between Phillips and any funding source disclosed by Carlisle, Phillips authorizes the Fiduciary or Escrow to recognize the presentation of this signed agreement [as an] earned demand for payment of an amount equal to 2½% of the gross funding accepted by Phillips from the source and/or representative, agent, or broker thereof furnished through the efforts and/or Carlisle.  This payment will be

recognized as a completely earned fee by Phillips for Carlisle [sic] services.

c. It is understood that final approval of financing resides with the financial providers and institutions and that this is not to be construed by Phillips as a warranty that said proposed financing will be granted and that it is understood that Carlisle is acting on a best efforts basis. Phillips recognizing the foregoing, agrees to cooperate with Carlisle and provide the necessary documentation and assistance required to complete the financing package and redevelopment.

d. In further recognition of the management and consulting services rendered by Carlisle to Phillips to oversee the redevelopment of the project and building rehabilitation, Phillips agrees to compensate Carlisle from the development budgeted funding a 5% fee to be charged against the gross amount of the project and to be paid in semi-monthly payments, as authorized deductions from and thru the fiduciary or escrow so established."

On or about January 22, 2000, Carlisle, through Frezados, issued a letter to Phillips in which Carlisle required Phillips to execute a quitclaim deed for the property to Carlisle, which was executed by the parties on January 22, 2000, and recorded by Frezados on January 25, 2000.[1] The January 22, 2000, letter was considered by the parties to be an amendment to the

---

[1] There was a factual dispute in the testimony concerning whether Carlisle required this quitclaim deed in order to proceed with the Agreement; Phillips testified that it was required by Carlisle and Gary Blank testified that Phillips suggested the quitclaim deed because she was

original Agreement executed by the parties.  Once the project was completed, Phillips was to record a  return quitclaim deed (Carlisle to Phillips).

On or about March 20, 2000, Blank, on behalf of Carlisle, issued a letter to Bob Fioretti, Phillips' attorney, entitled "Funding for restoration at 630 S. Wabash, Chicago, Illinois" in which he stated that he had a construction commitment from J.W. Young through his local representative, Wesley Taylor, and that he had, through attorney Bill Rochos, "set in motion to have an interim bridge loan put in place this week."  Attached to that letter was a letter from J.W. Young dated March 2, 2000, in which Young agreed to "deposit and make available an $8,000,000 line of credit for the rehabilitation of the hotel located at 630 S. Wabash.  After the hotel has been rehabed [sic] and is in operation, we will change the line of credit to a long-term note with an interest rate of 1% over the prime rate."  On March 21, 2000, Blank and Frezados sent a letter to Fioretti on March 21, 2000, in which they stated that Bill Rochos scheduled a closing for that Friday with his investor group.  They then stated that, as a result, Carlisle would be able to provide Phillips with funds.  Wesley Taylor of the Taylor Group Corporation issued a letter dated March 22, 2000, to Blank in which he confirmed the loan arrangements with J.W. Young.  However, on  March 22, 2000, Phillips recorded the return deed, and neither she nor her

concerned about building violations from the city.

attorney appeared at the March 24, 2000, closing, thus terminating the Agreement.

Attorney Rochos issued a letter dated March 24, 2000, to Blank in which he confirmed the availability of a $650,000 loan for 630 S. Wabash, making reference to a letter of commitment for said loan issued to Blank dated March 21, in which the collateral for the loan was specified as a "First Mortgage and Assignment of Rents encumbering the real estate at 630 S. Wabash."

Carlisle subsequently sent a letter to Phillips dated March 28, 2000, asking her to execute a quitclaim deed for the property to Carlisle and a land trust to allow Carlisle "to provide the funding for the restoration work, and to allow us to use the property as collateral." Carlisle's attorney, John Partelow, sent a letter to attorney Fioretti as to the "closing on the $8.65 million dollar financing package put together by Carlisle for this project." Taylor sent a letter to Carlisle dated May 23, 2000, in which he confirmed the availability of an $8 million loan for which the collateral would be a first mortgage on the property. According to Taylor's letter, Carlisle would be the initial borrower, but at the end of the 12-month construction period, the construction loan would be converted to a permanent loan to Phillips, which would mature in seven years.

Blank testified that when Phillips terminated the Agreement, Carlisle filed a verified complaint against Phillips in the chancery division, case No. 00-CH-5638, on April 11, 2000. Carlisle sought to quiet title, for specific performance and other relief, including $750,000 as damages. Blank stated that the benefit Carlisle would have received from the Agreement with Phillips was a fee of at least $615,000. In that verified complaint, Carlisle stated the following:

"a. On November 10, 1999, Carlisle and Phillips entered into a written

5

agreement for the development of property. The agreement provided that Carlisle would act as agent of, and consultant for, Phillips in connection with the redevelopment and management of the rehabilitation of the property.

b. The agreement provided, among other things, that Carlisle would seek and arrange financing for the redevelopment and rehabilitation of the property into a hotel and would manage the project during the construction and rehabilitation phase.

c. After the signing of the agreement, Carlisle did the following in furtherance of the agreement: (a) reviewed preliminary engineering reports regarding the property and prepare initial plans for the project; (b) met with the following departments of the City of Chicago: Building, Zoning, and the Department of Planning to obtain preliminary approvals for the project; (c) undertook substantial efforts to clear numerous title defects on the property including multiple pending City of Chicago building violation cases, judgements and other matters which represented clouds on the title; (d) obtained title commitments and surveys of the property; (e) engaged in preliminary discussions with general contractors regarding the project; and (f) sought and arranged commitments for $650,000 in interim financing and $8,000,000 in construction financing for the project.

d. Thereafter, and in furtherance of the agreement between the parties, Carlisle did the following: (a) sought and obtained commitments for $8,650,000

6

in interim and construction financing for the project on terms acceptable to all parties, including Phillips, (b) met and consulted with various government agencies to seek preliminary approvals for the project, (c) met and consulted with the City Department of Planning to confirm the availability in Tax Increment Financing District, (d) met and consulted with Villager Franchise Systems, Inc. regarding a franchise agreement for the proposed hotel, (e) met with Hinkle Engineering and reviewed preliminary engineering performed by Hinkle, (f) developed preliminary budget projections and estimates, and (g) discussed the project with prospective contractors. All of these efforts were undertaken with the knowledge, authorization and participation of Phillips.

e. By mid March of 2000, Carlisle had completed its preliminary efforts, with the full knowledge and participation of Phillips, and the parties scheduled a closing on the loans obtained by Carlisle for the project. That closing was set by agreement of the parties, including Phillips, for March 24, 2000. With the knowledge and consent of Phillips, a title commitment was obtained, the survey was updated and various documents were prepared and reviewed by the parties and their attorneys, including Phillips' attorney, in anticipation of the closing set for March 24, 2000.

f. By virtue of the terms of the November 10, 1999, consulting agreement and the January 22, 2000, letter amending the original agreement, Carlisle was the equitable owner of the property."

Meanwhile, on May 3, 2000, the Secretary of State sent Frezados and Blank a letter, advising them that Phillips had brought to the attention of the Illinois Securities Department of its office (Department) that Carlisle had been acting as a loan broker, but that the Department's records indicated that Carlisle had neither registered as a loan broker nor claimed an exemption from registration. The letter requested Carlisle to provide certain information about its transaction with Phillips, including why it had required her to transfer ownership of the building to it, and about its loan broker transactions since January 1, 1997. In response, Carlisle denied that it had ever acted as a loan broker and stated that it had never engaged in loan broker activities. On June 14, 2000, the Secretary issued a temporary order of prohibition against plaintiffs, stating that the consulting agreement was a loan broker agreement and they had not registered as loan brokers. The order also prohibited them from acting as loan brokers until further order. Plaintiffs then requested a hearing.

At the hearing, plaintiffs contended that they were not loan brokers and had not acted as such in their transaction with Phillips, so they were not required to register. Plaintiffs made no argument concerning any exemption to the registration requirement based on that contention. Phillips testified that plaintiffs insisted that she convey the property to them by quitclaim deed. Conversely, Blank testified that Phillips asked Carlisle to take title to the building because she was concerned about building code violations and a potential eminent domain proceeding by the City. Blank also testified that the funding he had arranged would not be extended to Phillips, but would be made available to Carlisle, and that he intended to personally guarantee the loan. Taylor testified that he intended to make a loan to Carlisle and that the loan would be secured by

the property.  He stated that he would not have agreed to make the loan if it had not been secured

by the property and had there been a default on the loan, he would have expected to take the

property.

The hearing officer further found that on July 18, 2000, pursuant to section 15-45 of the

Act (815 ILCS 175/15-45 (West 2000)), the Department issued to plaintiffs a subpoena *duces*

*tecum* for the production of books, documents, papers, charts and graphs regarding the current

matter, returnable on or before August 4, 2000.[2]  Plaintiffs failed to produce those items, and an

order was entered on October 2, 2000, in which plaintiffs were to fully comply with the terms of

the subpoena by 9 a.m. on October 13, 2000.  Because plaintiffs failed to comply, an order was

entered on November 22, 2000, in which plaintiffs were banned from presenting any witness

testimony except from themselves personally.

The Secretary ultimately concluded that plaintiffs were loan brokers as defined by the

Act and that they had failed to register and file applications for registration as such.  The

Secretary also concluded that plaintiffs failed to fully comply with the Department's subpoena,

all of which resulted in plaintiffs being permanently prohibited from acting as loan brokers and

engaging in loan brokerage services in the State of Illinois.  Carlisle was also fined $5,000 and

plaintiffs Blank and Frezados were each fined $2,500.

---

[2]The scope of the original subpoena had been reduced, instead of seeking financial

records from January 1, 1997, forward, the subject subpoena sought financial records from

January 1, 1999, forward.

1-05-2096

After the hearing, plaintiffs sought judicial review in the circuit court. Before the circuit court, plaintiffs challenged the Secretary's determinations that they had violated the following sections of the Act: section 15-5.15 (815 ILCS 175/15-5.15 (West 1998)), section 15-10 (815 ILCS 5/15-10 (West 1998)), and section 15-45 (815 ILCS 175/15-45 (West 2000)).

The circuit court found it uncontroverted that plaintiffs had acted as loan brokers within the meaning of the Act and that they had failed to register as required by the Act. The court also found that plaintiffs did not meet the exemption from registration provision of the Act (815 ILCS 175/15-80(5) (West 2000)) because they were to receive a fee prior to procurement of the financing, namely, title to the property. As to plaintiffs' due process claim, the court found it to be unclear, as the Act specifically authorized the Secretary to compel the production of documents. The court further found that as plaintiffs had the opportunity to contest the scope of the subpoena before the hearing officer and the hearing officer made a determination as to the subpoena, plaintiffs received all process that was due. This appeal followed.

On appeal, plaintiffs raise the following issues for review: (1) whether the evidence, as adduced at the hearings through the witnesses and documentary evidence provided, supports the Secretary of State's conclusions of fact and law that: (a) plaintiffs violated section 15-10 of the Illinois Loan Brokers Act by failing to register, (b) plaintiffs were not exempt from registration as loan brokers pursuant to section 15-80(5) of the Act; and (c) plaintiffs violated section 15-45 of the Act by failing to comply with certain paragraphs of the subpoena *duces tecum* issued by the Secretary of State; and (2) whether the Secretary considered all of the evidence in making his findings of fact, and whether those factual findings support the conclusions of law.

10

## ANALYSIS

On appeal, we review the administrative agency's decision and not the circuit court's determination. Village of Oak Park v. Village of Oak Park Firefighters Pension Board, 362 Ill. App. 3d 357, 365 (2005). " 'The applicable standard of review, which determines the degree of deference given to the agency's decision, depends on whether the question presented is one of fact, one of law, or a mixed question of law and fact.' " Village of Oak Park, 362 Ill. App. 3d at 365, quoting AFM Messenger Service, Inc. v. Department of Employment Security, 198 Ill. 2d 380, 390 (2001). The factual findings of the administrative agency are considered *prima facie* true and a correct (Schultz v. Edgar, 170 Ill. App. 3d 36, 38 (1988)), and a reviewing court will only reverse if the administrative decision is against the manifest weight of the evidence (Murdy v. Edgar, 103 Ill. 2d 384, 391 (1984)). Pure questions of law are reviewed *de novo*. MacDonald v. Board of Trustees of the Park Ridge Police Pension Fund, 294 Ill. App. 3d 379, 382 (1998). Mixed questions of law and fact are reviewed under the clearly erroneous standard. Village of Oak Park, 362 Ill. App. 3d at 365.

In order to address plaintiffs' contention that the evidence did not support the Secretary's conclusion that they violated the Act by failing to register as loan brokers, we must first determine whether the evidence supports a determination that they were in fact loan brokers.

Under section 15-5.15 of the Act, a loan broker is defined as "any person who, in return for a fee from any person, promises to procure a loan for any person or assist any person in procuring a loan from any third party, or who promises to consider whether or not to make a loan to any person." 815 ILCS 175/15-5.15 (West 1998).

1-05-2096

Here, the evidence presented at the hearing clearly established that plaintiffs agreed to assist Phillips in obtaining a loan from a third party, namely Taylor, for a fee. The fact that plaintiffs also committed to perform, and did perform, other services does not detract from the main purpose of the consulting agreement between the parties, to assist Phillips in obtaining a loan to rehabilitate the property. Accordingly, plaintiffs were acting as loan brokers within the meaning of the statute as a matter of law.

Section 15-10 of the Act makes it unlawful for any person to engage in the business of loan brokering unless registered under the Act. 815 ILCS 175/15-10 (West 1998). It is uncontroverted that plaintiffs did not register as loan brokers with the Secretary of State. Since we have concluded that plaintiffs were loan brokers within the meaning of the Act, it necessarily follows that they violated the Act by failing to register.

For the first time on appeal, plaintiffs contend that they were exempt from registration as loan brokers pursuant to section 15-80(5) of the Act, which provides that the following category of persons are exempt from registration: "[a]ny person whose fee is wholly contingent on the successful procurement of a loan from a third party and to whom no fee, other than a bona fide third party fee, is paid before the procurement." 815 ILCS 175/15-80(5) (West 1998).

It bears noting that throughout these proceedings, it has been plaintiff's contention that they are not loan brokers and therefore not subject to any provisions of the Act, making an exemption unnecessary. Apparently plaintiffs intend to abandon that theory on appeal, and instead raise the exemption issue. "*The law in Illinois is well established that if an argument is not presented in an administrative hearing, it is waived and may not be raised for the first time on appeal. James*

12

*L. Hafele Associates v. Department of Employment Security*, 308 Ill. App. 3d 983, 987 1999 . Since this argument was not presented during the hearing, plaintiffs have waived it. Even if the argument was considered on its merits, the fact that plaintiffs required Phillips to quitclaim the property to them prior to procurement of the loan that was to be made in Carlisle's name without any consideration to Phillips establishes that title to the property was a fee.

Finally, the evidence presented at the hearing supports the Secretary's conclusion that plaintiffs violated section 15-45 of the Act by failing to fully comply with the Department's subpoena. That section lists the powers of the Secretary of State to, among other things, c ompel the production of books, records and other documents. 815 ILCS 175 15-45 12 West 1998 .

Here, the Department's subpoena requested certain financial records of plaintiffs, which they refused to submit, indicating that the records were irrelevant as they were not loan brokers or subject to the Act. As noted previously, the Agreement between plaintiffs and Phillips was clearly a loan brokering agreement within the meaning of the Act and, as such, subjected plaintiffs to the requirements of the Act. Plaintiff's failure to comply with the subpoena was a direct violation of the Act and is supported by the evidence.

We conclude that the evidence presented at the hearing support the findings of fact and conclusions of law made by the Secretary.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

GARCIA, P.J., and WOLFSON, J., concur.