# Illinois Official Reports

## Appellate Court

---

**Village of Buffalo Grove v. Board of Trustees of the Buffalo Grove Firefighters' Pension Fund**, 2020 IL App (2d) 190171

---

| | |
|---|---|
| Appellate Court Caption | THE VILLAGE OF BUFFALO GROVE, Plaintiff-Appellant, v. THE BOARD OF TRUSTEES OF THE BUFFALO GROVE FIREFIGHTERS' PENSION FUND and KIM HAUBER, Defendants-Appellees. |
| District & No. | Second District No. 2-19-0171 |
| Filed | January 17, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 18-MR-784; the Hon. Diane L. Winter, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | William H. Nichols, Gregory R. James, and Chad R. DeGroot, of Laner Muchin, Ltd., of Chicago, for appellant. |
| | Carolyn Welch Clifford, Michael B. Weinstein, and John E. Motylinski, of Ottosen Britz Kelly Cooper Gilbert & Dinolfo, Ltd., of Naperville, for appellee Board of Trustees of the Buffalo Grove Firefighters' Pension Fund. |
| | Thomas W. Duda and Thomas E. Mazur, of Law Offices of Thomas W. Duda, of Palatine, for other appellee. |

Richard J. Reimer and Brian J. LaBardi, of Reimer & Dobrovolny PC, of Hinsdale, for *amici curiae* Illinois Public Pension Fund Association *et al.*

Margaret Angelucci and Matt Pierce, of Asher, Gittler & D'Alba, Ltd., of Chicago, for *amicus curiae* Associated Fire Fighters of Illinois.

Matthew S. Jarka, of Asher, Gittler & D'Alba, Ltd., of Chicago, for *amicus curiae* Buffalo Grove Professional Firefighters' Association.

Robert J. Smith Jr., Benjamin E. Gehrt, and Paul A. Denham, of Clark Baird Smith LLP, of Rosemont, for *amici curiae* Northwest Municipal Conference *et al.*

Tacy F. Flint and Caroline A. Wong, of Sidley Austin LLP, of Chicago, and Carter G. Phillips, of Sidley Austin LLP, of Washington, D.C., for *amicus curiae* Illinois Municipal League.

| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion. |
|---|---|
| | Presiding Justice Birkett and Justice Burke concurred in the judgment and opinion. |

## OPINION

¶ 1    The defendant the Board of Trustees of the Buffalo Grove Firefighters' Pension Fund (Board) issued a decision finding that the defendant Kim Hauber, the widow of former firefighter John Hauber (Hauber), was entitled to receive survivor's benefits accruing from a line-of-duty (duty) pension following Hauber's death from colon cancer. The plaintiff, the Village of Buffalo Grove (Village), which had intervened in the Board proceedings, filed an administrative review action. The circuit court affirmed the Board's decision, and the Village now appeals.

¶ 2                                    I. BACKGROUND

¶ 3    Hauber was born in 1967 and joined the Buffalo Grove Fire Department in May 1994 as a firefighter/paramedic. His job duties included, among other things, responding to emergency medical and fire calls, providing rescue services including removing fire or accident victims to safe locations, and participating in post-fire salvage operations. The job requirements included the ability "to face possible exposure to carcinogenic dusts, such as asbestos, toxic substances such as hydrogen cyanide, acids, carbon monoxide, or organic solvents either through inhalation or skin contact." Records produced by the fire department showed that

during his career Hauber responded to at least 127 fire calls that included building fires, vehicle fires, and outdoor fires involving flammable chemicals.

¶ 4 In May 2014, after 20 years of service with fire departments in Buffalo Grove and other municipalities, Hauber was diagnosed with colon cancer. In October 2014, he applied for a duty disability pension or, in the alternative, an occupational disease disability pension. By June 2015, Hauber's cancer had gone into remission, and he was able to return to work full time. He withdrew his application for a disability pension, on which the Board had not yet ruled.

¶ 5 Unfortunately, Hauber's cancer returned in 2017. In June 2017, he underwent genetic testing, and in July his treating physician at the cancer center, Dr. George Salti, noted that the test "showed no deleterious mutation" that would suggest a genetic cause for the cancer. In August 2017, Hauber filed two new applications for disability pensions. The first sought a duty pension for disabling back pain, which he stated arose from a May 2017 on-the-job incident. The second sought an occupational disease pension for his colon cancer.

¶ 6 Duty disability pensions are governed by section 4-110 of the Illinois Pension Code (Code):

"§ 4-110. Disability pension—Line of duty. If a firefighter, as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty or from the cumulative effects of acts of duty, is found *** to be physically or mentally permanently disabled for service in the fire department, so as to render necessary his or her being placed on disability pension, the firefighter shall be entitled to a disability pension ***." 40 ILCS 5/4-110 (West 2014).

¶ 7 Occupational disease disability pensions are governed by section 4-110.1 of the Code. That section includes a legislative finding that firefighters are often exposed to, among other things, "heavy smoke fumes, and carcinogenic, poisonous, toxic or chemical gases," and it establishes a presumption that certain diseases are caused by firefighting work, as long as various requirements are met:

"§ 4-110.1. Occupational disease disability pension. The General Assembly finds that service in the fire department requires firefighters in times of stress and danger to perform unusual tasks; that firefighters are subject to exposure to extreme heat or extreme cold in certain seasons while performing their duties; that they are required to work in the midst of and are subject to heavy smoke fumes, and carcinogenic, poisonous, toxic or chemical gases from fires; and that these conditions exist and arise out of or in the course of employment.

***

Any active firefighter who has completed 5 or more years of service and is unable to perform his or her duties in the fire department by reason of a disabling cancer, which develops or manifests itself during a period while the firefighter is in the service of the fire department, shall be entitled to receive an occupational disease disability benefit during any period of such disability for which he or she does not have a right to receive salary. In order to receive this occupational disease disability benefit, (i) the type of cancer involved must be a type which may be caused by exposure to heat, radiation or a known carcinogen as defined by the International Agency for Research on Cancer and (ii) the cancer must (and is rebuttably presumed to) arise as a result of service as a firefighter." *Id.* § 4-110.1.

¶ 8        As required, the Board set about obtaining independent medical evaluation (IME) reports from three doctors. Hauber's medical records and employment records, including the records of his fire calls, were provided to the doctors. About that time, Hauber was advised that he likely had only two weeks to live. Consequently, although the Board had not yet obtained the IME reports, the Board held an emergency hearing on September 5, 2017, for the limited purpose of preserving Hauber's testimony.

¶ 9        In November 2017, Dr. Daniel Samo issued an IME report and a certification of disability. Like all of the IME reports received by the Board in this case, it was based solely on a review of Hauber's medical records and the medical literature, not on any examination of Hauber. Dr. Samo opined on whether Hauber qualified for (a) a duty disability pension based on his back injury and (b) an occupational disease disability pension based on his colon cancer. As to the back injury, Dr. Samo found that it was not Hauber's primary disabling condition (the colon cancer was) and that there was "no way to judge if it would be disabling" given the other disabling effects of the cancer. Further, there was no objective change in the condition of Hauber's back following the May 2017 incident.

¶ 10       As for the colon cancer, Dr. Samo evaluated it solely in the context of whether it met the criteria for an occupational disease disability pursuant to section 4-110.1 of the Code. Dr. Samo found that Hauber qualified for such a pension. Specifically, he certified that Hauber's cancer was "a type of cancer which may be caused by exposure to heat, radiation, or a known carcinogen as defined by the International Agency for Research on Cancer" (IARC), that Hauber's disability resulted "from service as a firefighter and/or paramedic," and that the cancer manifested itself while Hauber was in the service of the fire department and it arose from that service. In his report, Dr. Samo described five "major studies" that were relevant to his opinions. Two of these, the 2006 LeMasters study (a review and meta-analysis of 32 studies on cancer among firefighters) and the 2013 Daniels study (studying the incidence of cancer in firefighters in San Francisco, Chicago, and Philadelphia from 1950 through 2009), found an association between firefighting and colon cancer. The three other studies did not. Dr. Samo found that the Daniels study was the "most robust" study and believed that its conclusions were the most reliable. He stated that he "would therefore be of the opinion that there is an association between firefighting and *** Hauber's cancer."

¶ 11       Dr. Edward James produced a certification of disability and an IME report in December 2017, finding that Hauber was permanently disabled by his colon cancer. Dr. James went farther than Dr. Samo, addressing whether the cancer resulted from "the performance of an act of duty or from the cumulative effects of acts of duty," an issue that bore on whether Hauber qualified for a duty disability pension based on the cancer. He concluded that this was "medically possible." He also certified that Hauber's cancer met the criteria for an occupational disease disability pension. In his report, Dr. James opined that it was "possible that [Hauber's] risk of developing colon cancer was significantly increased due to his service as a firefighter/paramedic." This opinion was based on the facts that Hauber did not have colon cancer when he was first hired, that he developed colon cancer while employed as a firefighter, and that his genetic testing "did not reveal a specific genetic basis for his cancer." The opinion was also based on medical literature, including the "Baris *et al* study" and the "Demers *et al* study," which showed a "statistically significant excess risk for colon cancer in firefighters with at least 20 years of service."

¶ 12    Hauber died of colon cancer at age 51 on January 27, 2018. At that point, the Board had not yet ruled on his applications for disability pensions, as it was required to wait for the third IME report.

¶ 13    On February 5, 2018, Hauber's widow applied for survivor's benefits of a duty pension pursuant to section 4-114 of the Code, which provides that a pension shall be paid to a firefighter's survivors if, among other things, the firefighter died "as a result of any illness or accident" but was not receiving an occupational disease or duty disability pension at the time of death (40 ILCS 5/4-114 (West 2018)). Section 4-114 sets the level of pension benefits payable to survivors under various scenarios. Under section 4-114(i), the pension to a survivor of a firefighter who dies "as a result of sickness *** resulting from the performance of an act of duty or from the cumulative effects of acts of duty" is 100% of the firefighter's salary on the last day of service, "notwithstanding subsection (d) or any other provision of this Article." *Id.* § 4-114(i). The first part of section 4-114(i), which sets out the standards for duty-level survivor's benefits, and section 4-110, which governs a firefighter's application for a duty disability pension, are essentially identical.

¶ 14    Soon after receiving the application for survivor's benefits, the Board granted interim nonduty pension benefits (equal to 75% of Hauber's final pay) to the widow. These interim benefits were paid while the three applications were pending, without prejudice to her application for the higher, duty pension benefits.

¶ 15    The third IME report, from Dr. Marina Kuznetsova, was issued on March 5, 2018. Her certification of disability stated that she was "unsure" whether it was medically possible that Hauber's cancer resulted "from the performance of an act of duty or from the cumulative effects of acts of duty." In her report, Dr. Kuznetsova mistakenly stated that there was "definitely no genetic testing of Mr. Hauber." That mistake affected her opinion regarding the cause of his cancer:

> "The main question of this case is the causation of Mr. Hauber's cancer. The colon cancer, according to the current data, may be caused by multiple factors such as diet, excessive weight, alcohol consumption, sedentary lifestyle, and definitely genetic predisposition. At this point, we do not routinely test patients for genetic predisposition for colon cancer. We base our genetic assessment only on the family history. In Mr. Hauber's family, there was no indication of colon or breast cancer, though information only on the very close relatives was provided in the records. Colon cancer may be associated with BRCA 1 and BRCA 2 mutation which could be potentially tested, but again, as I said, it is not a routine exam for colon cancer patients at this point. Given the information, we have to assume that Mr. Hauber most likely had no genetic predisposition. At the same time, though, the onset of colon cancer usually occurs in patients who are genetically predisposed to this disease, and that definitely plays a role in this case.
>
> I have reviewed literature which is available regarding the cancer incidence in firefighters. It is general consensus in the medical society that firefighters have high risk for cancer development in general. *** As far as colon cancer is concerned, the data is very controversial. Some articles show there may be some positive mild correlation and some other articles say there is negative correlation. This data is definitely not sufficient for definitive conclusion of the cause of cancer in this unfortunate individual. There is also information on relation of the duration of the

exposure to carcinogens during the firefighting and cancer development. There is no such data regarding colon cancer specifically, though.

In conclusion, Mr. Hauber definitely had 20 years of exposure to the hazardous materials. He developed early colon cancer and died of the disease. He was permanently disabled at the time of the diagnosis. [But] I do not believe we have enough evidence to support the lack of genetic predisposition for colon cancer in this case. There is definitely no genetic testing of Mr. Hauber and the family history is limited to immediate relatives. *** I have worked in Oncology for more than 45 years and treat a fair number of patients with colon and rectal cancer. I understand that my personal statistics are not necessarily correlating with the statistics in the rest of the medical community, but I definitely did not see an increased number of firefighters versus non firefighters with this disease in my practice over the years. I understand this is not enough to conclude Mr. Hauber's occupation as a firefighter was not a contributing factor of development of the cancer in this unfortunate individual."

Dr. Kuznetsova concluded that she could not say that Hauber's cancer was caused by his service as a firefighter.

¶ 16     The Board heard the three applications on March 23, 2018. The Village successfully petitioned to intervene in the Board proceedings, which consisted solely of oral argument.

¶ 17     In May 2018, the Board issued its decision. Its findings of fact, which contained Hauber's job description and a detailed summary of his medical treatment over time, included the following. At the time of his hire in 1994, Hauber reported no smoking or alcohol use and weighed 170 pounds. In 2014, upon his first doctor's visit for colon issues, he reported no smoking and negligible alcohol use, and he weighed 194 pounds. Dr. Salti's notes regarding the June 2017 genetic testing stated that "[t]his genetic test lowers the likelihood that Mr. Hauber's cancer was due to a hereditary cause, however, not all mutations are detectable and, not all genes were tested." Dr. Salti stated that, because an underlying cause for Hauber's cancer had not been determined, "a hereditary cause remains possible." However, "[g]iven the negative genetic test results, the normal tumor IHC for MLH 1, MSH2, MSH6 and PMS2 results, and the lack of a strong family history of cancer, an underlying gene mutation cause of his cancer is unlikely." Hauber's father, a smoker, had died of lung cancer in his eighties, but there was no other family history of cancer. The Board also took note of an affidavit from the Buffalo Grove Fire Department's deputy chief, which stated that Hauber had participated in over 409 hours of safety training and had never been cited for a safety infraction and that the fire department had not experienced "an excessive rate of cancer diagnoses" among its active and retired firefighters (Hauber had received the only colon cancer diagnosis).

¶ 18     The Board next considered each of the IME reports. The Board recognized that Dr. Samo had explicitly noted the results of Hauber's genetic testing and that Dr. Samo supported the award of an occupational disease disability pension based on the cancer and the denial of a duty disability pension based on the back injury. Similarly, the Board noted Dr. James's attention to the results of the genetic testing and the minimal incidence of cancer in Hauber's family. Dr. James certified that Hauber met the requirements for a duty disability pension based on Hauber's cancer as well as an occupational disease disability pension. As to Dr. Kuznetsova, the Board noted her repeated (erroneous) assertions that a genetic source for Hauber's cancer could not be ruled out because no genetic testing had been done. Her conclusion was not definitive, stating only that she was "unsure" whether his cancer resulted from a single act of

duty or from the cumulative effects of acts of duty, as would be necessary to qualify for a duty disability pension.

¶ 19 The Board's findings of fact included the following. Hauber had been in good health and physical condition before he developed colon cancer, "in contrast to the factors typically responsible for contributing to the development of colon cancer, such as poor diet, excessive weight, alcohol consumption, tobacco use, or sedentary lifestyle." All three IME physicians found that Hauber's cancer was permanently disabling. Dr. James had opined that Hauber's cancer met the causation requirements for not only an occupational disease disability pension (a documented association between the disease and his service as a firefighter) but also a duty disability pension, as it was "medically possible" that his cancer resulted from the performance of an act of duty or from the cumulative effects of acts of duty. Dr. Samo did not opine on whether Hauber's cancer met the requirements for a duty disability pension but did find that it "arose as the result of his service as a firefighter/paramedic," based on studies showing a correlation between firefighting and colon cancer.

¶ 20 The third physician, Dr. Kuznetsova, was unsure whether Hauber's colon cancer was caused by an act of duty or the cumulative effects of acts of duty. However, the Board discounted her opinion, because it was based on the mistaken belief that Hauber had not undergone genetic testing. The Board stated that it "assign[ed] more weight" to the reports and opinions of Drs. Samo and James than Dr. Kuznetsova, as Drs. Samo and James more accurately reviewed the records and were more definitive in their conclusions. Accordingly, the Board found the conclusions of Drs. Samo and James to be "more persuasive and reliable" than that of Dr. Kuznetsova regarding the cause of Hauber's cancer. The Board further found Dr. Samo's review of the medical literature to be particularly reliable, as he was a principal member of the National Fire Protection Association Technical Committee on Fire Service Occupational Safety and Health and thus was "well-versed" on firefighting-related exposures. As for the affidavit offered by the deputy fire chief, the Board found that it was primarily anecdotal, and thus assigned it little weight.

¶ 21 The final paragraph of the Board's conclusions of fact stated: "In considering the totality of the evidence and resolving any conflicts therein, the Board hereby finds that Kim Hauber has met her burden of proving that FF/PM Hauber died as a result of colon cancer, which he developed as a result of his performance of an act of duty or the cumulative effects of acts of duty as a firefighter/paramedic with the Village of Buffalo Grove Fire Department."

¶ 22 The Board then set out several "conclusions of law." It found that it had jurisdiction over Kim Hauber's application for survivor's benefits. It further found that Hauber's two applications for disability pensions were moot because he had died before the Board could make any final determination on those applications.

¶ 23 The Board noted that Kim Hauber bore the burden of proving that she qualified for survivor's benefits under section 4-114(i) of the Code. It found that, as Hauber met the service requirements for an occupational disease disability pension and his cancer was of a type that can be caused by exposure to heat, radiation, or a known carcinogen as defined by the IARC, a rebuttable presumption arose that his colon cancer resulted from his service as a firefighter. There was no evidence of a genetic or other cause that would rebut this presumption. The Board concluded that, if Hauber had survived his colon cancer, he would have met his burden of proving either a duty disability pension or an occupational disease disability pension based on that cancer. He would not have met the requirements for a duty disability pension based on

his back injury. By a 3 to 2 vote, the Board declared Hauber's disability pension applications moot and granted Kim Hauber's application for survivor's benefits at a duty pension level.

¶ 24 The Village filed an action for administrative review in the circuit court, arguing that the Board had improperly conflated the statutory standards for an occupational disease pension and a duty disability pension and had essentially applied the occupational disease statute's rebuttable presumption of causation to the consideration of whether Hauber's colon cancer had been caused by an act of duty or the cumulative effects of acts of duty. The Village also argued that the Board should not have found Hauber's two disability applications moot and that the evidence at most supported only an occupational disease pension. After briefing and oral argument, the circuit court affirmed the Board's decision. It viewed the Board's finding that Hauber's cancer met the standard for an occupational disease pension as having been made in the alternative in case the duty pension was reversed on appeal. The Board applied the rebuttable presumption of causation in this alternative analysis, but not in its consideration of Hauber's eligibility for a duty disability pension. The court found that the Board did not act improperly in mooting Hauber's pension applications. The court found that the Board's decision was adequately supported by the evidence, as the decision was supported by the IME reports, medical literature, and evidence that Hauber was exposed to smoke and other noxious materials through his 23 years of service as a firefighter and his participation in 127 emergency fire calls. The Village now appeals that ruling.

¶ 25                                             II. ANALYSIS

¶ 26 In an administrative review case, the appellate court reviews the decision of the agency, not that of the trial court. *Lindemulder v. Board of Trustees of the Naperville Firefighters' Pension Fund*, 408 Ill. App. 3d 494, 500 (2011). The Village argues that (1) the record does not support the Board's determination that Hauber's cancer was caused by an act of duty or the cumulative effects of acts of duty, (2) the lack of evidence of causation demonstrates that the Board impermissibly applied the occupational disease statute's presumption of causation, and (3) the Board erred in declaring moot Hauber's two disability pension applications. We begin with the last of these arguments, as it is a preliminary issue. We will address the applicable standard of review in the context of each argument.

¶ 27                                    A. Declaration of Mootness

¶ 28 The Village asserts that the Board erred in concluding that Hauber's two applications for a disability pension were moot, arguing that nothing in the applicable statutes mandates that conclusion. The Village then argues that, because the applications were not moot, the Board should first have addressed whether Hauber was eligible for a lower, nonduty pension under the occupational disease statute. It argues that granting him such a pension would have precluded his widow from obtaining the higher, duty pension benefits. The defendants counter that the Board's decision to treat Hauber's two applications as moot was supported by section 4-110.1, which does not provide for benefits to a deceased firefighter, and they argue strenuously that, even if such benefits had been granted, Hauber's widow would have been entitled to the higher, duty-level pension benefits based on section 4-114(i), which applies "notwithstanding *** any other provision of this Article." 40 ILCS 5/4-114(i) (West 2018).

¶ 29 A matter is moot if " 'no actual controversy exists or if events have occurred that make it impossible *** to grant *** effectual relief.' " *In re Marriage of Eckersall*, 2015 IL 117922,

¶ 9 (quoting *In re Marriage of Peters-Farrell*, 216 Ill. 2d 287, 291 (2005)). Rulings on mootness are reviewed *de novo*. *People v. Custer*, 2019 IL 123339, ¶ 17 (claims of mootness present questions of law, which are reviewed *de novo*).

¶ 30    Our review requires us to engage in statutory interpretation, the fundamental principles of which are familiar. We must begin by examining the language of the statute, which is the most reliable indicator of the legislature's objectives in enacting a particular law. *Yang v. City of Chicago*, 195 Ill. 2d 96, 103 (2001). The statutory language must be afforded its plain and ordinary meaning, and where the language is clear and unambiguous we must apply the statute without resort to further aids of statutory construction. *In re Michael D.*, 2015 IL 119178, ¶ 9. We will not depart from the plain language of a statute by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent. *Id.* "One of the fundamental principles of statutory construction is to view all provisions of an enactment as a whole," and thus "words and phrases must be interpreted in light of other relevant provisions of the statute." *J.S.A. v. M.H.*, 224 Ill. 2d 182, 197 (2007). Further, under the doctrine of *in pari materia*, "where different statutes touch on the same or related subject matter, we consider them together so as to render a harmonious result." *State Farm Mutual Automobile Insurance Co. v. Burke*, 2016 IL App (2d) 150462, ¶ 39.

¶ 31    The Board found that Hauber's death made it impossible to grant him effective relief on his two pending disability pension applications, as Hauber could no longer receive any benefits even if his applications were granted. The Village argues that Hauber's death did not render his application for an occupational disease disability pension moot because his widow could receive survivor's benefits once his application was granted. In support, the Village points to the following language in section 4-110.1, the occupational disease statute: "If a firefighter dies while still disabled and receiving a disability pension under this Section, the disability pension shall continue to be paid to the firefighter's survivors ***." 40 ILCS 5/4-110.1 (West 2018).

¶ 32    The Village's reading of this statute is contrary to its plain language. Section 4-110.1 provides that a firefighter's survivors may receive a continuation of the deceased firefighter's occupational disease disability pension if the firefighter dies while (a) still disabled and (b) receiving such a pension. Here, however, the second of these requirements was not met, because Hauber was not "receiving a disability pension" at the time of his death—his application was still pending before the Board due to the lack of a third IME report. Section 4-110.1 does not state that a disability pension must be paid to a firefighter's survivors even if the firefighter's occupational disease disability pension application was still pending at the time of his or her death. We will not read such a requirement into the statute. See *Michael D.*, 2015 IL 119178, ¶ 9.

¶ 33    The Village argues that our reading of section 4-110.1 is unduly narrow and could prevent a firefighter's estate from receiving disability benefits accruing prior to the firefighter's death for which the firefighter would otherwise have qualified. Our decision today should not be construed as supporting this result. We hold only that, in the present circumstances, where neither the deceased firefighter's surviving spouse nor the firefighter's estate sought an award of predeath benefits and the surviving spouse instead filed a separate application for survivor's benefits, nothing in section 4-110.1 compelled the Board to proceed on the deceased firefighter's pending disability pension applications rather than the surviving spouse's application.

¶ 34 　　In light of our conclusion that the Board was permitted to treat Hauber's occupational disease disability pension application as moot, we need not address the parties' arguments regarding the interaction between sections 4-110.1 and 4-114(i) of the Code.

¶ 35 　　　　　　　　　　B. Sufficiency of the Evidence of Causation

¶ 36 　　Having concluded that the Board did not err in proceeding only on the widow's application for survivor's benefits, we turn to the primary issue on appeal: whether the Board's decision to grant that application was supported by sufficient evidence of causation. The Village argues that the award of survivor's benefits based on a duty pension requires evidence that the disabling condition (here, colon cancer) was caused by a specific, identifiable act or acts of duty, not simply a general correlation between a firefighter's service and his disabling condition. The defendants respond that the evidence amply supports the Board's determination that Hauber's colon cancer was the result of "the cumulative effects of acts of duty" and charge that the Village's argument is merely an improper request that this court reweigh the evidence.

¶ 37 　　　　　　　　　　　　1. Standard of Review

¶ 38 　　Whether the evidence supports a pension board's determination to grant or deny an application for a duty pension is a question of fact, and it is therefore subject to the manifest weight of the evidence standard of review. *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 505 (2007); *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 534 (2006) (*per curiam*); see also *Covello v. Village of Schaumburg Firefighters' Pension Fund*, 2018 IL App (1st) 172350, ¶ 42 (whether an act of duty caused or contributed to a firefighter's disability is treated as a factual question; collecting cases). "An administrative agency decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). "In examining an administrative agency's factual findings, a reviewing court does not weigh the evidence or substitute its judgment" for that of the agency. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204 (1998). Thus, "[t]he mere fact that an opposite conclusion is reasonable or that the reviewing court might have ruled differently will not justify reversal of the administrative findings." *Abrahamson*, 153 Ill. 2d at 88. Rather, "[i]f the record contains evidence to support the agency's decision, that decision should be affirmed." *Marconi*, 225 Ill. 2d at 534.

¶ 39 　　The Village argues that causation in this case was not a strictly factual determination and instead involved a mixed question of fact and law, *i.e.*, whether a given set of facts (regarding Hauber's cancer) met a statutory standard (that it "result[ed] from *** the cumulative effects of acts of duty"). Mixed questions of fact and law are subject to the slightly less deferential "clearly erroneous" standard of review. *Belvidere*, 181 Ill. 2d at 205. Under this standard, a court must affirm the Board's decision unless, after reviewing the entire record, it is " 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

¶ 40 　　In support of this argument, the Village cites *Belvidere* and two appellate cases: *Wilfert v. Retirement Board of the Firemen's Annuity & Benefit Fund of Chicago*, 318 Ill. App. 3d 507, 514 (2000), and *Virden v. Board of Trustees of the Firefighters Pension Fund*, 304 Ill. App. 3d 330, 335 (1999). In *Belvidere*, the issue was whether a municipality's decision to contract out

for paramedic services was a mandatory subject of collective bargaining because it fell within a statutory definition, *i.e.*, decisions that " 'affect[ ] wages, hours and other terms and conditions of employment.' " *Belvidere*, 181 Ill. 2d at 203 (quoting 5 ILCS 315/4 (West 1994)). Because the labor relations board had engaged in statutory interpretation, its decision was subject to the "clearly erroneous" standard. *Id.* at 205.

¶ 41    In *Wilfert*, the pension board's decision involved a legal issue because, to determine whether a firefighter remained disabled, the board was required to construe and apply the term "disability," a statutory term "subject to legal interpretation." *Wilfert*, 318 Ill. App. 3d at 514. The appellate court also found that the trial court had committed legal error by shifting the burden of proof from the employer to the firefighter. *Id.* at 518. *Virden* similarly involved a legal error, where the trial court mistakenly applied the definition of "act of duty" from a police pension statute to a case involving a firefighter, who was subject to a different statutory definition of "act of duty." *Virden*, 304 Ill. App. 3d at 335.

¶ 42    The Village argues that this case similarly presents a mixed question of fact and law because it involves interpreting the statutory language that the disabling condition must "result *** from the cumulative effects of acts of duty," and thus the "clearly erroneous" standard applies. We note, however, that the Village also asserts that the Board's decision should be reversed under either standard.

¶ 43    We find the cases cited by the Village inapposite, as they do not relate to the issue of causation, which is a factual issue. *Covello*, 2018 IL App (1st) 172350, ¶ 42; *Lindemulder*, 408 Ill. App. 3d at 500. Further, the Village's argument relates to the sufficiency of the evidence, which our supreme court has held is subject to the manifest weight of the evidence standard. *Wade*, 226 Ill. 2d at 505; *Marconi*, 225 Ill. 2d at 534. Finally, unlike in *Belvidere*, *Wilfert*, and *Virden*, the Board's determination in this case did not involve any issues of statutory interpretation. Thus, we agree with the defendants that the Board's decision was a purely factual determination, subject to the manifest weight standard of review.

¶ 44                    2. Evidence of Causation—What Must Be Shown?

¶ 45    Kim Hauber applied for survivor's duty pension benefits under section 4-114(i), which provides such benefits when "a firefighter *** dies *** as a result of sickness, accident, or injury incurred in or *resulting from the performance of an act of duty or from the cumulative effects of acts of duty*." (Emphasis added.) 40 ILCS 5/4-114(i) (West 2018).[1] To be entitled to a duty pension, a firefighter need not show that his or her job duties were the sole or primary cause of the disabling condition; the causation requirement is met if an act of duty (or the cumulative effects of acts of duty) contributed to or exacerbated the disability. *Prawdzik v. Board of Trustees of the Homer Township Fire Protection District Pension Fund*, 2019 IL App (3d) 170024, ¶ 40; *Scepurek v. Board of Trustees of the Northbrook Firefighters' Pension Fund*, 2014 IL App (1st) 131066, ¶ 27; *Village of Oak Park v. Village of Oak Park Firefighters Pension Board*, 362 Ill. App. 3d 357, 371 (2005).

¶ 46    Although section 4-110 (which governs duty pensions for firefighters in smaller municipalities like the Village) does not define the term "act of duty," courts have held that it

---

[1]As noted (*supra* ¶ 13), this section mirrors the language of section 4-110, which governs a firefighter's application for a duty disability pension. The parties agree that the case law involving section 4-110 applies to section 4-114(i) cases.

means the same thing as "act of duty" as defined in section 6-110 (40 ILCS 5/6-110 (West 2018)), a companion statute governing duty disability pensions for firefighters in large cities. *Jensen v. East Dundee Fire Protection District Firefighters' Pension Fund Board of Trustees*, 362 Ill. App. 3d 197, 203-04 (2005). Under that definition, an "act of duty" includes (1) "[a]ny act imposed on an active fireman by the ordinances of a city," (2) any act imposed "by the rules or regulations of its fire department," or (3) "any act performed by an active fireman while on duty, having for its direct purpose the saving of the life or property of another person." 40 ILCS 5/6-110 (West 2018). During the circuit court proceedings, the Village agreed that the term "act of duty" encompasses "essentially any acts that the firefighter engages in on the job," and the Village does not dispute that, at a minimum, the 127 documented fire calls that Hauber participated in were "acts of duty." Thus, the question is whether any evidence in the record supports the Board's determination that the cumulative effects of Hauber's acts of duty caused or contributed to his colon cancer. See *Marconi*, 225 Ill. 2d at 534 ("If the record contains evidence to support the agency's decision, that decision should be affirmed.").

¶ 47    The Village's overarching argument is that an award of a duty pension is only proper when there is evidence that the disabling condition was caused by a specific act of duty or the cumulative effects of acts of duty and that no such evidence was considered by the Board or the IME physicians. Instead, it asserts, the Board improperly relied on assumptions that Hauber was exposed to carcinogenic materials simply by virtue of his firefighting service. The Village argues vigorously that a disease arising from the work conditions inherent in firefighting is not the same as a "sickness *** resulting from *** the cumulative effects of acts of duty." To support this argument, it cites *Covello* and *Rokosik v. Retirement Board of the Firemen's Annuity & Benefit Fund of Chicago*, 374 Ill. App. 3d 158 (2007).

¶ 48    *Covello* involved a firefighter's application for a duty disability pension based on an incident that allegedly exacerbated his post-traumatic stress disorder (PTSD) to the point that it became disabling. The pension board denied the application. *Covello*, 2018 IL App (1st) 172350, ¶ 36. In concluding that the pension board's decision was not against the manifest weight of the evidence, the appellate court found that Covello had not shown a causal link between his disabling PTSD and the one work-related incident he identified, which had occurred several years earlier and after which he had continued to work. *Id.* ¶ 49. In citing *Covello*, the Village emphasizes the appellate court's additional finding that, although Covello had responded to a number of other calls that were "indisputably traumatic" (*id.*) and although firefighters in general were "repeatedly exposed to stressful and gruesome events," "the stress inherent in the job" could not serve as the basis for duty disability benefits (*id.* ¶ 50).

¶ 49    We do not find this statement in *Covello* persuasive, for several reasons. To begin with, the statements emphasized by the Village were not necessary to the appellate court's holding. Once the court determined that the evidence supported the Board's finding of no causal link between the one work-related incident Covello identified and the fact that his PTSD eventually became disabling, under the manifest weight of the evidence standard, the court was bound to affirm the pension board's decision. That is, even if the court had found that other calls to which Covello had responded exacerbated his PTSD, at most that would have provided conflicting evidence that the pension board was permitted to weigh and resolve. See *Abrahamson*, 153 Ill. 2d at 88. The court still would have been correct to affirm the pension board, because some evidence in the record supported the denial of a duty disability pension. See *Marconi*, 225 Ill. 2d at 534.

¶ 50    Moreover, the *Covello* court cited no support for its statement that conditions inherent in the job could not serve as a basis for a duty pension, and that statement is contrary to other case law. See *Lindemulder*, 408 Ill. App. 3d at 501 ("a line-of-duty pension may be awarded if the [applicant] proves that the exposure to smoke, fumes, or some other condition of his employment exacerbated his condition"); *Scalise v. Board of Trustees of the Westchester Firemen's Pension Fund*, 264 Ill. App. 3d 1029, 1033 (1993) (same). *Covello* simply did not grapple with the fact that a duty disability pension can be appropriate not only where the disabling condition results from a single, identifiable "act of duty" but also where it arises from the "cumulative effects of acts of duty." 40 ILCS 5/4-110 (West 2018). For all of these reasons, we do not find the Village's reliance on *Covello* to be well founded.

¶ 51    Instead, when considering the cumulative impact of repeated exposures to injurious conditions, we find *Oak Park* more instructive. In that case, a firefighter's hearing deficit became disabling, and he applied for a duty disability pension. The pension board heard conflicting evidence, including measurements of decibel levels for noise in the fire trucks when the sirens were on, medical records from treating physicians showing hearing decline over several years, and IME reports opining that the hearing loss was most likely genetic in nature, as several of the firefighter's family members had also experienced the onset of hearing loss at about the same age. *Oak Park*, 362 Ill. App. 3d at 359-63. The pension board granted the duty pension, finding that (1) the firefighter had presented sufficient evidence that his hearing loss was caused by the cumulative effects of acts of duty and, (2) even if the hearing loss was hereditary in origin, it was exacerbated by exposure to noise from firefighting equipment and sirens. *Id.* at 364. On review, the appellate court affirmed, noting the conflicts in the evidence and finding that the pension board's decision was not against the manifest weight of the evidence. *Id.* at 373. As the issue was whether the firefighter's hearing loss was exacerbated by the cumulative effects of acts of duty, the court did not require the firefighter to identify specific acts of duty that caused or contributed to his hearing loss. Applying this approach here, we find that the Board did not err by declining to require the widow to identify specific acts of duty that contributed to the development of Hauber's cancer.

¶ 52    The Village's second argument on this front is that the standards for awarding a duty pension under section 4-110 are designed to be different than those for awarding an occupational disease pension under section 4-110.1 but the IME reports and the Board's decision improperly conflated those two standards. In support, the Village cites *Rokosik* (and a supreme court decision, *Bremer v. City of Rockford*, 2016 IL 119889, that agreed with *Rokosik*'s reasoning on this point).

¶ 53    *Rokosik* is distinguishable on its facts. *Rokosik* involved the widows of two Chicago firefighters who had applied for occupational disease disability pensions pursuant to section 6-151.1 (40 ILCS 5/6-151.1 (West 2000)). The firefighters did not seek duty disability pensions, and no evidence was taken regarding whether they qualified for duty disability pensions. The firefighters were granted occupational disease disability pensions and received those benefits through their deaths. However, after the firefighters' deaths, the widows claimed that they should receive survivor's benefits at the higher, duty level. *Rokosik*, 374 Ill. App. 3d at 159-61. The widows argued that "the grant of an occupational disability benefit necessarily entitles a widow to a duty annuity when her husband's occupational disability permanently prevents him from returning to active duty" and that the occupational disease disability and duty disability statutes were "identical in purpose." *Id.* at 168. The pension board ruled against them

- 13 -

on this point, and the appellate court affirmed, finding that the two statutes did not have the same purposes or requirements for eligibility and that an award of an occupational disease pension was not equivalent to an award of a duty pension. *Id.* at 171. Importantly, however, although the appellate court held that proof of qualification for an occupational disease pension was not sufficient in itself to show qualification for a duty pension, it declined to hold that "a widow of a firefighter who was receiving an occupational disability benefit at the time of his death *** may never qualify for a duty annuity," and it rejected any such rule. *Id.*

¶ 54        *Rokosik*, in which the applications were for occupational disease benefits only and the pension boards never considered or ruled on whether the firefighters qualified for duty benefits, is distinguishable from this case. Here, the Board was considering an application for duty benefits, and it reviewed the evidence and found that the requirements for such benefits in *Rokosik* were met. We also observe that the language of the provision governing survivor's benefits (40 ILCS 5/6-140 (West 2004)) differs in important ways from the language of section 4-114(i), the provision applicable here.

¶ 55        We recognize the principle expressed in *Rokosik* and affirmed in *Bremer*: that the two statutes serve different goals and have different eligibility requirements and a firefighter's qualification for an occupational disease pension is not, by itself, sufficient to support the award of a duty pension. *Rokosik*, 374 Ill. App. 3d at 171; *Bremer*, 2016 IL 119889, ¶ 32. Among other reasons, under the occupational disease statute, a firefighter with cancer (such as Hauber) may be entitled to a presumption that his cancer was caused by his work as a firefighter, while no such presumption applies to duty pension cases. The issue is the relevance of this principle here.

¶ 56        The Village concedes that Hauber would have been able to meet the requirements for an occupational disease pension simply on the basis of his long firefighting service and the medical literature linking that service and colon cancer, but it argues that an applicant should have to show something more to qualify for the higher, duty pension. The Village argues that here this "something" must be a link between Hauber's cancer and an identifiable act or acts of duty.

¶ 57        We reject this argument because it ignores the statutory language authorizing a duty pension for a condition that is caused or exacerbated by the "cumulative effects of acts of duty." The common meaning of that term indicates that a duty pension can be awarded for a condition that emerges slowly over a period of years, without an identifiable triggering incident. This common-sense reading of the statutory language is supported by ample case law. See *Oak Park*, 362 Ill. App. 3d at 372 (award of duty pension was supported by IME physician's opinion that firefighter's hearing loss was " 'more likely than not' " caused or exacerbated by noise levels common to firefighting); *Prawdzik*, 2019 IL App (3d) 170024, ¶¶ 53-58 (affirming grant of duty pension for PTSD that became disabling over time and criticizing the argument that inherent conditions of firefighting cannot serve as basis for duty disability pension); see also *Lindemulder*, 408 Ill. App. 3d at 501 (award of duty pension is justified where the applicant can show that exposure to smoke and noxious fumes "or some other condition of his employment exacerbated his condition"); *Scalise*, 264 Ill. App. 3d at 1033 (same).

¶ 58        Statutory language must be afforded its plain and ordinary meaning (*In re Michael D.*, 2015 IL 119178, ¶ 9) and interpreted so as to avoid rendering any part of the statute meaningless or superfluous (*Blum v. Koster*, 235 Ill. 2d 21, 29 (2009)). Here, the term "cumulative effects of

acts of duty" must be given its ordinary meaning and may not be read so narrowly as to remove that term from the statute. Just as the firefighter in *Oak Park* was not required to identify any particular act or acts of duty that caused or exacerbated his hearing loss, Hauber was not required to point to one or more specific acts of duty as causing or contributing to his cancer.

¶ 59        Instead, we find that the best way to ensure that the award of a duty pension is justified is to apply the statutory standards for such a pension, without reference to whether the evidence might also justify the award of some different pension. Here, the Board's decision was supported by the expert opinions contained in the IME reports as well as by evidence that Hauber responded to at least 127 fire calls. Although the fire call reports did not document Hauber's exact role and exposure at each fire, he was expected to be prepared to confront various noxious and carcinogenic substances at any fire. Further, members of the Board had experience firefighting and were well able to evaluate for themselves the likely level of Hauber's exposure during those calls. The record also contained medical evidence supporting the finding that the cause of Hauber's cancer likely was work-related, including test results that failed to find any genetic basis for the cancer and medical records showing that, apart from his cancer, Hauber was in good health, did not smoke, and drank alcohol only moderately. The Village attacks this evidence in various ways, but none is persuasive.

¶ 60        Unlike in many cases in which courts have overturned pension boards' determinations, here none of the IME reports were contrary to the Board's finding that the cumulative effects of Hauber's acts of duty over his 23 years as a firefighter caused or contributed to his colon cancer. Dr. James certified that it was medically possible that Hauber's cancer resulted from the cumulative effects of Hauber's acts of duty. His opinion rested not only on the medical studies he identified, which showed a "statistically significant excess risk for colon cancer in firefighters with at least 20 years of service," but also on Hauber's medical records and the lack of a genetic basis for Hauber's cancer.

¶ 61        Dr. Samo did not opine directly on whether the cumulative effects of Hauber's acts of duty caused or contributed to his cancer. However, Dr. Samo did certify that Hauber's cancer arose "from service as a firefighter and/or paramedic" and that Hauber met the standard for an occupational disease pension. While qualification for an occupational disease pension is not in itself enough to meet the requirements for a duty pension (*Rokosik*, 374 Ill. App. 3d at 171; see also *Bremer*, 2016 IL 119889, ¶ 32), the evidence supporting the two may overlap. Thus, Dr. Samo's opinion that Hauber's cancer most likely arose from his service as a firefighter was relevant to the Board's determination of whether Hauber qualified for a duty pension and supports that determination. Further, the Board placed particular weight on Dr. Samo's opinion that a causal link was supported by the medical literature, because of his professional qualifications and particular expertise in firefighting-related exposures to noxious and potentially carcinogenic substances.

¶ 62        Even Dr. Kuznetsova, whose conclusions were the least definitive, did not certify that Hauber's cancer was *not* caused by his firefighting duties; she stated only that she was "unsure" whether such a causal link existed. And the Board's decision to give less weight to her opinion was reasonable, as she failed to note Hauber's genetic testing and indeed appeared to mistakenly rely on the purported lack of such testing.

¶ 63    The Village criticizes the IME reports as being based on conflicting medical studies.[2] However, these criticisms go to the weight that should be given the physicians' opinions, not to their admissibility. It was within the province of the Board to resolve any criticisms regarding the medical literature, and we conclude that the Board's careful review of that literature and the IME reports is not so lacking in foundation as to be reversible. *Belvidere*, 181 Ill. 2d at 204.

¶ 64    The Village also attacks the evidence documenting Hauber's response to at least 127 fire calls. It first asserts that this evidence was not "pointed to or relied upon" by the Board or the IME physicians. The Village is correct that, although the IME reports and the Board's decision mentioned Hauber's overall physical condition and his years of service as a firefighter, they did not explicitly refer to the 127 fire calls to which Hauber responded. But the records of these calls were in the administrative record, which the physicians had access to in rendering their opinions and which the Board reviewed prior to issuing its decision. Further, the Board's decision repeatedly referred to "Board Exhibit No. 8," materials produced by the Village's fire department that included the 127 fire call reports. There is no support for the Village's assertion that these reports were not considered by the Board in reaching its decision to grant duty pension benefits. And while it might have been better practice for the Board to have explicitly noted the reports, our analysis is not confined to those portions of the record specifically mentioned in the Board's decision. Rather, we may affirm an agency's decision on any basis appearing in the record. *Brazas v. Property Tax Appeal Board*, 339 Ill. App. 3d 978, 984 (2003).

¶ 65    The Village also argues that the fire call reports do not constitute evidence of actual exposure to noxious or carcinogenic substances, because the reports lack detail about Hauber's level of participation in fighting each of these fires. We disagree. Hauber's documented participation in 127 fire calls is circumstantial evidence of exposure to noxious and carcinogenic substances. That is to say, while the fire reports do not directly establish such exposure, they support the reasonable inference of exposure. They are not mere speculation. Any arguments about the strength or weakness of that evidence go to the weight it should be given, not whether it is evidence at all.

¶ 66    To summarize the evidence, two of the three IME reports supported a causal connection between Hauber's cancer and the cumulative effects of his acts of duty. The third IME report, which neither supported nor contradicted that conclusion, was appropriately discounted given the factual errors that it contained. Further, the record contained at least some evidence of Hauber's exposure to noxious and carcinogenic substances, as well as genetic and other medical evidence showing a decreased likelihood that Hauber's cancer arose independent of his service as a firefighter. In light of this evidence, the Board's decision to grant Kim Hauber survivor pension benefits at the duty level was not against the manifest weight of the evidence.

---

[2] At the Board hearing, the Village did not object to the admission of the IME physicians' opinions regarding the medical literature, and thus it may not now argue that they were hearsay. See *Jackson v. Board of Review of the Department of Labor*, 105 Ill. 2d 501, 508-09 (1985) ("when hearsay evidence is admitted without an objection, it is to be considered and given its natural probative effect"; such evidence "may be considered by the administrative body and by the courts on review").

## C. Nonapplication of the Rebuttable Presumption

Finally, the Village argues that the Board erroneously applied the occupational disease pension statute's rebuttable presumption of causation (see 40 ILCS 5/4-110.1 (West 2018)) in evaluating whether the standards for a duty pension were met. The Village's argument rests on (1) the Board's references to findings related to occupational disease benefits in part of its decision and (2) the Village's belief that the Board must have applied the presumption, because otherwise the evidence of causation was insufficient to support a duty pension.

As to the first, the Board responds that its findings related to the occupational disease statute were included in the alternative, so it would not have to conduct a new hearing if a court later overturned its award of duty disability pension benefits. Our review of the Board's decision supports this assertion. And we have already rejected the Village's second contention, that evidence of causation was lacking. Accordingly, the record does not support this assignment of error.

## III. CONCLUSION

For the reasons stated, the judgment of the circuit court of Lake County and the decision of the Board are affirmed.

Affirmed.