**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 240548-U

Order filed July 24, 2025

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| STEVEN BOYLES, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Will County, Illinois. |
| | ) | |
| v. | ) | |
| | ) | Appeal No. 3-24-0548 |
| BOLINGBROOK FIREFIGHTERS' | ) | Circuit No. 23-MR-423 |
| PENSION FUND and the BOARD OF | ) | |
| TRUSTEES OF THE BOLINGBROOK | ) | |
| FIREFIGHTERS' PENSION FUND, | ) | The Honorable |
| | ) | John C. Anderson, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE PETERSON delivered the judgment of the court.
Presiding Justice Brennan and Justice Davenport concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The pension board erred in finding that plaintiff's disability was not duty related and in denying plaintiff's request for a line-of-duty disability pension on that basis. The appellate court, therefore, reversed the pension board's decision and remanded the case to the pension board with directions to award plaintiff a line-of-duty disability pension.

¶ 2     Plaintiff, Steven Boyles, a Bolingbrook firefighter who injured his lower back while on duty and helping to lift an injured person on a stretcher, filed an application with the

Bolingbrook Firefighters' Pension Fund for a line-of-duty disability pension. Following an evidentiary hearing, the board of trustees of the fund (Board) found that Boyles was disabled for service as a firefighter but that his disability was not duty related. The Board denied Boyles's request for a line-of-duty disability pension on that basis and awarded Boyles a not-in-duty disability pension instead. The trial court upheld the Board's decision on administrative review. Boyles appeals. We reverse the Board's decision and remand this case to the Board with directions to award Boyles a line-of-duty disability pension.

¶ 3                                    I. BACKGROUND

¶ 4        Boyles worked as a firefighter-paramedic for the Village of Bolingbrook (Village) for over 20 years. Over the course of his career, Boyles injured his lower back several times while he was on duty. On September 24, 2021, Boyles injured his lower back again at work, while helping to lift an injured person on a stretcher. That was the last time that Boyles worked full and unrestricted duty as a firefighter for the Village. In April 2022, after Boyles had completed courses of physical therapy and work-conditioning/work-hardening therapy (work-conditioning) to no avail, he filed an application with the Board for a line-of-duty disability pension. In case the Board denied his request, Boyles also sought, in the alternative, to receive a not-in-duty disability pension instead.

¶ 5        Over a year later, in June 2023, the Board held a hearing on Boyles's application for a disability pension. During the proceedings, the Board heard the testimony of live witnesses (including the testimony of Boyles and his work partner, Matthew Trnka) and admitted into evidence numerous exhibits, including hundreds of pages of Boyles's medical records and the reports and/or deposition testimony of several doctors that had conducted independent medical

examinations (IMEs) of Boyles. The evidence presented at the hearing has been summarized in the paragraphs below.

¶ 6        The live testimony and the medical records that were submitted to the Board established the following information. Boyles was hired by the Village's fire department in July 2000. Before being hired, Boyles had to submit to and pass a preemployment physical examination. He did so, without any problems with his lower back being noted. Prior to being hired full-time by the department, Boyles previously worked as a part-time firefighter for the department from 1995 to 2000 and had also worked for another fire department for about nine months. Boyles had never been injured in those prior fire department jobs and had never injured his lower back in any other activities, sporting events, or in working in a different profession.

¶ 7        During his career as a full-time firefighter for the Village, Boyles injured his lower back at work on approximately eight different occasions. The first time that Boyles did so was in August 2001. Boyles was at the scene of a vehicle accident and injured his lower back while lifting a patient on a stretcher. He experienced lower back and right leg pain. Boyles went to the Bolingbrook Medical Center for care and completed a course of physical therapy. He was off work for  approximately one month but then returned to work in full and unrestricted duty.

¶ 8        The second time that Boyles injured his lower back at work was in June 2002. During a training exercise, Boyles was using the jaws of life tool and injured his lower back when the tool popped out of place. He was transported to a medical facility, had x-rays taken, and later had a magnetic resonance imaging (MRI) scan conducted. Boyles started a course of physical therapy and made good progress but was still having lower back pain.

¶ 9        A few months later (September 2002), Boyles went to see Dr. Matthew Ross, a neurosurgeon, for his pain. Upon meeting with Ross, Boyles told Ross about the June 2002

injury and about the medical treatment he had received. Boyles also told Ross that he had been having pain for about 2½ months and that the pain would start after he sat or stood for more than an hour or lifted over 70 pounds. Boyles brought with him to the appointment the prior MRI that had been conducted. According to Ross's report, the MRI showed that Boyles had a small disk bulge at the L5-S1 spine level, which did not appear to cause any significant nerve compression. The MRI also indicated that Boyles had a possible annular disk tear, but that could not be determined with certainty from the MRI. After examining Boyles, Ross believed that Boyles's symptoms were most likely caused by a lumbosacral sprain and recommended that Boyles participate in work-conditioning therapy. Boyles did so and eventually returned to work in full and unrestricted duty after being off work for about six months for the June 2002 injury.

¶ 10        The third time that Boyles injured his lower back while working for the fire department was in May 2003. Boyles was helping a paramedic lift a patient out of a vehicle at the scene of a vehicle accident when Boyles injured his lower back. Boyles was told to rest and to take over-the-counter medications. He was off work for less than a week and then returned to full and unrestricted duty.

¶ 11        The fourth time that Boyles injured his lower back at work was in December 2003. Boyles was helping to extricate a 400-pound person from a vehicle after a vehicle accident and injured his lower back. Boyles initially had a feeling of tightness in his lower back but then started feeling sharp pain in that area a few days later. He also had some pain that radiated into his left buttock but did not go down into his left leg.

¶ 12        Boyles went to see Dr. Ross for his injury. Upon examining Boyles, Ross believed that Boyles's pain was probably due to a lumbosacral sprain but noted that it was possible that the pain could be an early manifestation of a disk herniation. Ross recommended that Boyles

4

complete a course of physical therapy. Boyles did so and was able to return to work in full and unrestricted duty shortly before the end of the month.

¶ 13     In October 2005, Boyles had a follow-up visit with Dr. Ross. Boyles told Ross that he experienced daily lower back pain, but that it did not interfere with his ability to perform his work duties. Boyles stated further that the pain would flare up at times and that he would have to take prescription or over-the-counter medications and do the exercises that he had learned in physical therapy. After examining Boyles, Ross continued to believe that Boyles's lower back symptoms were the result of a lumbosacral sprain and commented in his report that although Boyles's MRI showed evidence of a disk bulge and an annular tear, there was no evidence that those conditions were causally connected to Boyles's symptoms. Ross later sent a letter to Boyles's attorney confirming that it was Ross's opinion that Boyles's disk pathology at the L5-S1 level (a bulging disk and an annular tear) was not causing or contributing to Boyles's lower back pain and that Boyles's pain was most consistent with a lumbosacral-strain injury, especially since Boyles did not have symptoms of an S1 radiculopathy (a condition often referred to as a "pinched nerve," where a nerve root in the spine is compressed or irritated).

¶ 14     The fifth time that Boyles injured his lower back at work was in May 2011. Boyles was doing some spring cleaning at the fire station and injured his lower back moving a bed. Boyles initially went to the occupational health center (referred to hereinafter at times as the center), which was where the Village's firefighters usually went to be treated for their injuries. Boyles told the doctor at the center that as he was moving the bed, he felt a sharp pain in his lower back, could not stand up, and had to be helped to his feet. Upon examining Boyles, the doctor diagnosed Boyles as having a lumbar back strain and noted that the strain was probably work related.

¶ 15    A few days later, Boyles went to see Dr. Ross for the injury. Boyles told Ross about how the injury had occurred and about the treatment that he had already received. Boyles's condition had slightly improved by that point, and he was in less pain. The pain extended into his right buttock but did not extend down into his right leg. After examining Boyles, Ross believed that Boyles had suffered a lumbosacral strain but noted that there was a possibility that Boyles's pain could be the early manifestation of a lumbar disk herniation, which, according to Ross, would only be known in the fullness of time. Ross recommended that Boyles complete a course of physical therapy. Boyles did so and eventually returned to work in full and unrestricted duty after being off work for approximately three months for the injury.

¶ 16    The sixth time that Boyles injured his lower back while at work for the fire department was in January 2014. Boyles was conducting a morning check of one of the fire engines and when he tried to pull a fire extinguisher out of a compartment, it got hung up, and he injured his lower back. Boyles initially went to the emergency room for treatment and was prescribed a muscle relaxer and some pain medication and was discharged from the hospital.

¶ 17    The following day, Boyles went to the occupational health center for his injury. He was seen by Dr. Pitsilos. Boyles told Pitsilos about how the injury had occurred and about the pain he was experiencing. Boyles stated that the pain was variable depending upon his activity level, that it was made worse by movement, and that it was radiating down his left leg to his left knee. Upon examining Boyles and ordering an x-ray of Boyles's lower back, Pitsilos diagnosed Boyles as having a strain/sprain of the lumbar region, along with radiculitis of the left lumbar region. Pitsilos recommended that Boyles avoid bending, lifting, or twisting for the time being and that he participate in physical therapy or have an MRI conducted if his condition did not improve.

¶ 18    A few days later, Boyles went to see Dr. Ross. Boyles told Ross about the injury, the medical treatment that he had received, and the current status of his pain. Among other things, Boyles stated that he was experiencing pain radiating down his left thigh to his knee. According to Boyles, he had never experienced pain going down into his legs with any of his previous injuries. Boyles did not experience any numbness or tingling with this particular injury but did feel like his leg would give out or buckle underneath him when the pain was severe. After examining Boyles, Ross believed that Boyles's pain was most likely due to a lumbosacral strain but noted in his report that the radiating pain down Boyles's leg suggested the possibility of a disk herniation. Ross recommended that Boyles take anti-inflammatory and analgesic medications and that he participate in physical therapy. Boyles did so, and after being off work for three or four months for the injury, was able to return to full and unrestricted duty.

¶ 19    The seventh time that Boyles injured his lower back at work was in May 2021. Boyles was performing cardiopulmonary resuscitation (CPR) on a patient in a narrow hallway, and the awkward position created an achy feeling in Boyles's lower back and discomfort in his left buttock. He was treated at the occupational health center for his injury. Boyles was diagnosed as having a lumbar strain, was given over-the-counter pain medications, and participated in a short course of physical therapy. He was off work for approximately 2½ weeks and then returned to full and unrestricted duty.

¶ 20    The eighth and final time that Boyles injured his lower back while at work for the fire department was the current or most recent injury, which occurred on September 24, 2021. Boyles reported for work that day shortly before his shift started at 7 a.m. At the start of his shift, Boyles performed a routine maintenance and readiness check on the department's vehicles and equipment without having any problems with his lower back. Throughout the day, Boyles and

7

his partner, Matthew Trnka, were dispatched to numerous calls. Boyles drove the fire engine to each of those calls and was able to get in and out of the vehicle without any difficulty.

¶ 21    Shortly before 4 p.m., Boyles was dispatched to his approximately sixth call of the day— a medical emergency where an elderly woman had fallen in her driveway and had possibly broken her hip or leg. Upon arriving at the scene, Boyles and the other emergency personnel saw that the woman was lying in the driveway. As Boyles was helping to lift the woman with a scoop stretcher, which was pretty low to the ground, he felt a twinge of pain in his lower back. When Boyles stood up, the pain increased dramatically and radiated down into his left leg. According to Boyles, he had not noticed back pain or any other problems that day prior to that point. He also had never experienced pain like that in his leg during any of his prior injuries, although he did have pain that went into his right thigh with his first lower back injury in 2001.

¶ 22    After the injury occurred, Boyles shuffled his way over to the fire engine and leaned on the front bumper. When the paramedics had placed the woman into the ambulance and Trnka had finished talking to the woman's husband, Boyles immediately told Trnka that he had hurt his back "really bad" lifting the woman and that the pain had gone "through the roof" when he stood up.

¶ 23    Trnka contacted the battalion chief and one of the lieutenants and told them that Boyles had been injured lifting a patient during a call. The battalion chief and lieutenant advised Trnka to take Boyles to the occupational health center, which was clear across town. Trnka assisted Boyles into the passenger side of the fire engine and started driving to the occupational health center. During transport, Boyles was in a lot of pain. It was difficult for him to sit in the seat because of the pain, and he was bracing himself to keep the pressure off his back. The pain was getting worse and was aggravated because of Boyles's seated position. At some point, Trnka told

8

Boyles that he thought Boyles should go to the hospital. Trnka pulled into a parking lot, recontacted the battalion chief and the lieutenant, and an ambulance was dispatched to Boyles's location.

¶ 24       After the ambulance arrived, one of the paramedics had to help Boyles out of the fire engine because Boyles could not get out of the engine on his own. The paramedics put Boyles onto a stretcher and placed him in the back of the ambulance. An intravenous line was started, and Boyles was given fentanyl for his pain. The fentanyl helped somewhat, but Boyles was still in a great deal of pain. The paramedics transported Boyles to the hospital.

¶ 25       At the hospital, Boyles was treated in the emergency room. Boyles told the emergency room doctor that he was experiencing sharp, shooting left lower back pain that radiated down his left buttock and into his left leg down to his knee. The medical personnel gave Boyles additional fentanyl because he was in a great deal of pain.

¶ 26       A computed tomography (CT) scan was conducted of Boyles's lower back. The scan showed that Boyles had three small bulging disks—one at the L2-L3 level, one at the L3-L4 level, and one at the L5-S1 level. Boyles also had some mild central canal stenosis and some moderate bilateral foraminal encroachment at some of those levels and a central disk protrusion at the L4-L5 level. The impression of the doctor who had read the scan and had prepared the scan report was that Boyles had multilevel lumbar spondylosis most prominent at the L4-L5 level with mild central canal stenosis and moderate bilateral foraminal encroachment secondary to disk degeneration, disk height loss, facet hypertrophy, and a central disk protrusion. The scan doctor recommended that the treating doctor look for a correlation for radiculopathy at that level of the spine.

¶ 27    The doctor who treated Boyles in the emergency room stated in his report that the CT scan showed degenerative disk disease with neural foraminal encroachment. The emergency room doctor diagnosed Boyles as having lumbar radiculopathy and told Boyles that he had a couple of bulging disks. According to Boyles, that was the first time that he was diagnosed with those conditions. Boyles was given pain medications and a muscle relaxant, was told to avoid any heavy repetitive lifting over 10 pounds, and was advised to follow up with his primary care provider and his back surgeon.

¶ 28    Approximately one week later, Boyles followed up with the doctors at the occupational health center, as he was required to do by the fire department. At that point, Boyles was still experiencing lower back pain that would shoot down his left leg to his knee. He saw Dr. Pitsilos. Upon examining Boyles, Pitsilos diagnosed Boyles as having intervertebral disk disorder with myelopathy in his lumbar region, lumbago (a general term for pain and stiffness in the lower back) with sciatica on the left side, and lower back pain. Pitsilos noted in his report that imaging studies (presumably, the CT scan results from the hospital) had shown multilevel disk bulges. Pitsilos also stated in his report that the cause of Boyles's current problem was related to Boyles's work activities. Boyles was given pain medications; was told to avoid lifting, pushing, pulling, or standing; and was referred for physical therapy.

¶ 29    The following week, Boyles saw Dr. Ross for the injury. Boyles told Ross about how the injury had occurred, the pain that he had experienced and was currently experiencing (including tingling going down into his left foot and possible weakness in his left leg), and the medical treatment that he had received. Ross reviewed the CT scan results from the hospital and noted that the results suggested the presence of a central disk herniation at the L4-L5 level and also showed bilateral stenosis at that same level. After examining Boyles, Ross's impression was that

Boyles had symptoms of sciatica that were most likely caused by the disk herniation and/or foraminal stenosis at the L4-L5 level. Ross recommended that Boyles have an MRI conducted and that he complete a course of physical therapy. Boyles started participating in physical therapy shortly thereafter.

¶ 30    An MRI was conducted in October 2021 and generally showed the same conditions that had been shown in the hospital CT scan. The impression of the doctor that had read the MRI and had prepared the MRI report was that Boyles had multilevel degenerative lumbar spondylosis most prominent at the L4-L5 level where there was moderate bilateral foraminal stenosis.

¶ 31    When he received the MRI results, Boyles went back to Dr. Ross for a follow-up appointment. Ross told Boyles that the MRI indicated there were some disk bulges or a disk herniation in his lower back that were potentially causing pressure on the nerve. In his report for the appointment, Ross stated more specifically that the MRI showed that Boyles had a central disk herniation at the L4-L5 level, bilateral foraminal stenosis at the same level, and some "minor dis[k] bulging" at the L2-L3 and L3-L4 levels. At that point, Boyles was still having a lot of pain radiating down through his left buttock and into his left leg and still had numbness and tingling below the knee and down into his toes. Ross's impression was that the L4-L5 disk herniation and/or foraminal stenosis could be responsible for Boyles's back and left leg pain. Ross recommended that Boyles have a nerve root block and steroid injection procedure performed to help further diagnose and treat Boyles's injury.

¶ 32    Boyles had the injection procedure conducted in December 2021. The report from the procedure indicated that Boyles's diagnoses, both before and after the procedure was conducted, was lumbar radiculopathy, low back pain, and lumbar degenerative disk disease. According to Boyles, the first injection, the nerve root block, relieved his pain for a few hours, but then the

11

pain returned to the same level as before. The second injection, the steroid shot, did not give Boyles much relief.

¶ 33    Later that same month, Boyles followed up with Ross, and they discussed the results of the injection procedure. Ross recommended that Boyles consider having surgery performed on his lower back as the next possible step in his treatment. The surgery that Ross was recommending was a four-part surgery at the L4-L5 level of Boyles's lower back. The surgery would consist of a laminectomy, facetectomy, foraminectomy, and diskectomy.

¶ 34    At or about that same time period, Boyles filed a workers' compensation claim for the September 2021 injury. In response to that claim, the workers' compensation insurer sent Boyles to Dr. Kern Singh, an orthopedic surgeon and professor of orthopedic surgery at Rush University Medical Center, to have an IME conducted. According to Boyles, the examination that Singh performed was only a quick, basic examination where Singh essentially had Boyles walk across the room, bend forward and backward as far as he could, and twist. After conducting the examination, Singh opined in his December 2021 written report that Boyles had suffered a muscle strain that was related to the work that Boyles had been performing as a firefighter on the date of the injury.[1] Singh did not believe, however, that surgery was necessary and recommended that Boyles participate in a work-conditioning program instead.

¶ 35    Boyles followed up with Ross in February 2022, and the two discussed Singh's report and recommendation. At that point in Boyles's treatment, the workers' compensation insurer was not willing to pay for surgery since Singh had stated that surgery was not needed. Ross still felt that surgery was warranted but recommended that Boyles participate in work-conditioning

[1]The IMEs conducted by Singh and the other doctors will be described in greater detail later in this order.

12

therapy as Singh had suggested. In making that recommendation, however, Ross discussed with Boyles the possible negative effects of delaying surgery—that the longer the nerve in his lower back was pinched or compressed by the bulges or the herniation, the longer it could take for the nerve to heal and recover, and that the nerve problem could ultimately, under a worst case scenario, become permanent.

¶ 36    Boyles participated in work-conditioning therapy for about four weeks. He went to therapy appointments four or five days a week for five or six hours a day. The sessions aggravated Boyles's injury and made his condition worse. After each session, Boyles would be in a lot of pain and would barely be able to walk. His entire left lower leg and left foot would be completely numb, and he would have difficultly bearing any weight on his left side. Boyles would have to ice those areas of his body, stay off his feet for a while, and usually lie down.

¶ 37    As Boyles was participating in the work-conditioning program, he kept Ross informed of the problems that he was having. Ross told Boyles that the problems were signs of Boyles's need to have surgery performed. While Boyles was trying to get the surgery approved, Ross sent Boyles to participate in additional physical therapy instead of the work-conditioning program in which Boyles had been participating.

¶ 38    In April 2022, Boyles received an addendum report from Dr. Singh. In the addendum report, Singh's opinion was still the same—that Boyles had suffered a soft tissue muscular strain of the lumbar spine that was work related. Singh stated in the addendum report that Boyles "ha[d] a normal neurological examination with full strength, sensation and no reflex changes" and that Boyles "ha[d] pain complaints in a nondermatomal distribution that [did] not objectify [the] need for restrictions." When Boyles was asked about those statements during his testimony before the Board, he maintained that Singh had never examined him a second time and that he

13

had not discussed his pain complaints with Singh. Singh ultimately concluded in his addendum report that Boyles's muscular strain had resolved and that Boyles could return to work in full and unrestricted duty.

¶ 39        Boyles contacted the fire chief and told him of Singh's addendum report. Boyles advised the chief that he could not return to work, despite what was stated in the addendum report, because Boyles's own doctor (Ross) had told Boyles that he needed surgery. As a result of Singh's addendum report, the temporary workers' compensation benefits that Boyles was receiving were terminated and Boyles had to draw from his accrued sick and vacation time to continue getting paid. In response to the addendum report, Dr. Ross sent a letter to Boyles's attorney strongly disagreeing with Singh's opinions. In the letter, Ross opined that Boyle was not able to return to work at that time and that Boyles's September 2021 work injury was the proximate cause of Boyles's lower back and radicular leg pain. Eventually, Boyles reached an agreement with the Village, and his temporary benefits were restored. Boyles was still receiving those benefits as of the date of the hearing before the Board.

¶ 40        During Boyles's testimony, he identified a photograph that showed gear and equipment that was substantially similar to what he wore on calls when he was working for the fire department. Boyles was also shown the job description for Village firefighters, and he identified which job duties he was no longer able to perform. As his testimony continued, Boyles stated that during his time in physical therapy and work-conditioning, his goal was always to build back up to where he could return to work for the department in full and unrestricted duty. Boyles had always been able to do so in the past when he was injured but could not do so for the most recent injury because, according to Boyles, the injury was far more severe and he needed surgery, which was repeatedly delayed.

14

¶ 41 In April 2022, Boyles filed his application for a disability pension. The following month, Boyles underwent the four-part surgery that Ross had recommended, even though the workers' compensation insurer had not approved the procedure, because Ross felt that it was imperative to get the pressure off the nerve in Boyles's lower back. To cover the cost of the surgery, Ross agreed to perform the procedure on a lien basis, with Boyles signing a promise to pay for the procedure.

¶ 42 Following the surgery, the healing process was slow and painful for Boyles and Ross recommended that Boyles participate in post-surgery physical therapy. Boyles went to physical therapy sessions three days a week. After his temporary benefits were restored and work-conditioning therapy was approved, the number of sessions that Boyles attended increased to four or five days a week. The therapy sessions helped somewhat, but Boyles still had quite a bit of pain and also had numbness and tingling in his lower left leg and foot. In December 2022, a functional status evaluation was conducted that showed that Boyles met less than 50% of the job demands required to function as a firefighter.

¶ 43 Boyles's last physical therapy session was near the end of 2022 or the beginning of 2023. No further physical therapy was ordered after that point by Dr. Ross because the amount of progress that Boyles was making had dwindled and Ross did not want to risk Boyles reinjuring himself or creating a new injury. When physical therapy ended, Boyles was at a point where any time he lifted anything 50 pounds or greater, he would start having symptoms, such as increased lower back pain that would go into his left buttock periodically and numbness and tingling in his left lower leg. Ross subsequently determined that Boyles was at maximum medical improvement (MMI) for the current injury.

¶ 44 As part of the disability claim process, the Board sent Boyles to have IMEs conducted by three different doctors: Dr. Wellington Hsu, Dr. Chintan Sampat, and Dr. Sepehr Sani. According to Boyles, his examination with Dr. Hsu was a typical examination. Hsu had Boyles walk back and forth, bend forward and backward, and asked Boyles about his injury and how it occurred. Boyles's examinations with Dr. Sampat and Dr. Sani were similar to the examination by Dr. Hsu, although Sani did not really ask Boyles about his pain.[2] In addition, Boyles's examination with Sani took place after a weekend in which Boyles had experienced a lot of pain in his lower back and his left leg and had constant tingling in his left leg and foot.

¶ 45 At the time of the hearing before the Board, Boyles was no longer in treatment with Dr. Ross. Neither Ross nor any of Boyles's other treatment providers had released Boyles to full and unrestricted duty. The only doctors that had found that Boyles could return to full and unrestricted duty were Dr. Singh (the workers' compensation doctor) and Dr. Sani (one of the Board's IME doctors).

¶ 46 Boyles's current diagnosis was that he was postoperative from a bulging disk with nerve root impingement at the L4-L5 level, but he had undergone the four-part surgery to correct that problem. Boyles had no intention of getting any further treatment since he had been told that he was at MMI. Because of his injury, Boyles was no longer able to do a lot of the things that he used to do with his children and other family members. During the course of a normal day, Boyles would get achy if he sat or stood for a long period of time and would have numbness and tingling in his leg and foot. If Boyles's lower back was really sore, he would ice it and would change positions (from sitting to standing and vice versa) every so often to try to relieve

---

[2]As noted previously, the IMEs will be described in greater detail later in this order.

whatever pain, numbness, or tingling that he was feeling. He would also take over-the-counter pain medications three to four days a week and a prescription pain medication as needed.

¶ 47    As indicated above, in addition to the live testimony that was presented at the hearing and the medical records that had been admitted into evidence, the Board also admitted into evidence the reports and/or deposition testimony of the doctors that had conducted IMEs of Boyles, along with some or all of those doctors' curricula vitae. In total, four IMEs were conducted—one for Boyles's workers' compensation case and three for Boyles's disability pension case.

¶ 48    As described earlier, the first IME that was conducted of Boyles was conducted in December 2021 by Dr. Singh, as part of Boyles's workers' compensation case. In conducting his IME of Boyles, Singh reviewed a small portion of Boyles's medical records—those dated from September 24, 2021 (the date of the current injury), to December 6, 2021 (the date of the injection procedure)—and also reviewed Boyles's October 2021 MRI results. In addition, Singh performed a physical examination of Boyles. After doing so, Singh prepared his IME report. In his report, Singh diagnosed Boyles as having a lumbar muscular strain and degenerative disk disease at the L4-L5 level. Singh believed that the muscular strain was caused by the September 2021 work incident. Singh did not feel, however, that Boyles's degenerative condition was caused by the incident. Instead, Singh believed that the degenerative condition was incidental to, and did not correlate with, Boyles's current symptoms. Singh also did not believe that the objective findings he made during his IME of Boyles supported Boyles's subjective pain complaint. In addition, Singh did not feel that Boyles had reached MMI for his condition and recommended that Boyles complete a course of work-conditioning therapy to reach MMI.

¶ 49    About four months later, in April 2022, Singh issued an addendum to the IME report he had prepared. Singh noted in the addendum report that he received additional medical records to

17

review. The additional records were dated from the end of November 2021 to April 2022 and included the reports from Boyles's most recent participation in work-conditioning therapy. The work-conditioning notes showed that Boyles was able to meet less than 50% of the physical job demands required to function as a Village firefighter. After reviewing the additional records, Singh's diagnosis of Boyles's conditions and the cause of those conditions remained the same. Singh now believed, however, that Boyles had reached MMI, that no further treatment was appropriate, and that Boyles could return to work in full and unrestricted duty.

¶ 50　　　　The second IME that was conducted of Boyles was conducted in August 2022 (the IME report was issued in September 2022) for Boyles's disability pension case by Dr. Chintan Sampat, a board-certified orthopedic surgeon. In conducting his IME, Sampat reviewed numerous documents, met with Boyles and obtained a medical history from him, physically examined Boyles, and prepared a written IME report. For this particular case, Sampat spent six hours reviewing Boyles's medical records. The records that Sampat reviewed, which were presumably provided by the Board, dated as far back as 2002, with reference to a 2001 lower back injury, and went forward from that point all the way through to Boyles's treatment for the current injury. Sampat also reviewed Boyles's job description, any pertinent information relating to Boyles's disability claim, and the IME report for the prior IME that was conducted by Dr. Singh (collectively referred to, along with the medical records, as Boyles's background information). Sampat's physical examination of Boyles in this case took approximately 35 minutes to complete, including the time that Sampat spent gathering a medical history from Boyles.

¶ 51　　　　After reviewing the background information, meeting with Boyles, and performing a physical examination, Sampat diagnosed Boyles as having an L4-L5 lumbar disk herniation with

18

radiculopathy. Sampat believed that the diagnosed condition and Boyles's surgery were related to a lumbar spine injury that Boyles had sustained in the course of his firefighting duties. In Sampat's opinion, Boyles was disabled because of the diagnosed condition (and not because of a preexisting condition or the aggravation of a preexisting condition), but the disability was only temporary since Boyles was only 3½ months post-surgery, at that time, and could reasonably be expected to resolve the condition by completing a course of work-conditioning therapy.

¶ 52        After Sampat had conducted his initial IME, he was later sent additional records to review and issued an addendum report in January 2023. In the addendum report, Sampat noted some new concerns that had arisen based upon his review of the additional records and recommended that he be allowed to conduct a second physical examination of Boyles to address those concerns and to more fully develop his medical opinions.

¶ 53        The Board acted on Sampat's recommendation and sent Boyles to Sampat for a second IME, which was conducted in February 2023 (the IME report was issued in March 2023). After addressing his concerns with Boyles and conducting a new physical examination, Sampat issued a second IME report. In the second IME report, only two of Sampat's opinions had changed. First, Sampat now believed that Boyles's disability was permanent (implicit in the report). Second, Sampat concluded that no further medical treatment was required with regard to Boyles's work injury.

¶ 54        The third IME that was conducted of Boyles was conducted in September 2022 for Boyles's disability pension case by Dr. Wellington Hsu, a board-certified orthopedic surgeon and assistant professor at Northwestern University Feinberg School of Medicine. In conducting his IME, Hsu reviewed Boyles's background information, met with Boyles and obtained a medical history from him, physically examined Boyles, and prepared a written IME report. In total, Hsu

19

spent approximately 6 hours reviewing Boyles's medical records and approximately 15-30 minutes conducting a physical examination of Boyles, including the time that Hsu spent gathering Boyles's medical history.

¶ 55      After reviewing the records and examining Boyles, Hsu diagnosed Boyles as having two conditions: (1) L4-L5 left-sided foraminal stenosis, status post-surgery (hemilaminotomy, medial facetectomy, and microdiscectomy); and (2) lumbar spondylosis. Hsu opined that the first condition was a disabling condition that prevented Boyles from performing the full and unrestricted duties of a firefighter because of Boyles's decreased range of motion in his lumbar spine. Hsu believed that the first condition was caused by an act of firefighting duty but felt that it was too early to determine whether Boyles's disability was permanent since, at that time, Boyles had surgery on his lower back four months earlier and could undergo additional physical therapy and rehabilitation that could possibly return him to work in full and unrestricted duty. According to Hsu, Boyles's second condition, lumbar spondylosis, was a preexisting condition that had required Boyles to obtain treatment at various times over the past 20 years. Hsu did not believe that an act of firefighting duty, nor the cumulative effect of such acts, had aggravated that preexisting condition.

¶ 56      After Hsu had conducted his initial IME, he was sent additional records to review and issued an addendum report in January 2023. In the addendum report, Hsu observed that Boyles had completed physical therapy and work-conditioning therapy after the surgery but could only meet less than 50% of the reported job demands required to function as a firefighter. Hsu opined, therefore, that Boyles had exhausted postoperative conservative care and that no further medical treatment was required. Although Hsu stated in the addendum report that the rest of his opinions

20

remained the same, it appeared from the report that Hsu was also now opining, although somewhat implicitly, that Boyles's disability was permanent.

¶ 57    The fourth and final IME that was conducted of Boyles was conducted in October 2022 for Boyles's disability pension case by Dr. Sepehr Sani, a board-certified neurosurgeon and assistant professor of Neurosurgery at Rush University. In conducting his IME, Sani reviewed Boyles's background information, met with Boyles and obtained a medical history from him, physically examined Boyles, and prepared a written IME report. Sani spent approximately 4½ hours reviewing Boyles's medical records and approximately 30 to 40 minutes conducting a physical examination of Boyles, including the time that Sani spent gathering a medical history from Boyles.

¶ 58    Upon reviewing the records and examining Boyles, Sani opined that Boyles suffered from two conditions. The first condition, a lumbosacral sprain, was caused by the September 2021 work incident and had since been resolved. The second condition, left degenerative disk disease at the L4-L5 level with a disk bulge and possible L4-L5 radiculopathy, was a preexisting condition with a very long-standing history that dated back to the early 2000s, as a 2002 MRI had shown that Boyles had degenerative disk changes and Boyles had reported daily lower back pain as early as 2005. Since that time, Boyles had experienced periods of exacerbation of the second condition—with resultant lower back pain and radiation to the lower extremities—that were treated conservatively. According to Sani, given Boyles's age and the progression of his degenerative lower back condition (the second condition) over the past 20 years, it was entirely possible that Boyles went on to develop a radiculopathy for which he was eventually treated surgically. Sani did not believe, therefore, that Boyles's second condition was caused or aggravated by his work as a firefighter or by the cumulative effect of such work. In addition,

21

because Boyles's surgery was successful in decompressing the nerve in that area and had completely healed and because Boyles's radiculopathy (regardless of the cause) had resolved after surgery without any neurological problems appearing, Sani's opinion was that Boyles was not disabled and that he could perform the full and unrestricted duties of a firefighter. In further support of that opinion, Sani commented that his review of the post-surgery MRI and his examination of Boyles did not reveal any objective evidence to suggest that Boyles was unable to perform full and unrestricted duties.

¶ 59        As with the Board's other IME doctors, after Sani had conducted his initial IME, he was later sent additional records to review. Sani issued an addendum report in February 2023. In the addendum report, Sani observed that the additional records had essentially revealed that Boyles had continued with physical therapy for a number of months after surgery until approximately December 2022, when Dr. Ross found Boyles to be at MMI and assigned a permanent work restriction to Boyles that limited Boyles to lifting only 50 pounds occasionally. The work restriction meant that Boyles could not return to full and unrestricted duty as a firefighter. Sani stated in the addendum report that after reviewing the additional records, his prior opinions had not changed and that he did not agree with the work restriction that Ross had assigned to Boyles.

¶ 60        In April 2023, Sani was deposed regarding his IME and addendum reports and his opinions related to Boyles's lower back injury. By the time of his deposition, Sani did not have independent recollection as to some of the things contained in his reports. His testimony, however, was generally consistent with the reports and served mainly to explain his opinions and the information provided in the reports in greater detail.

¶ 61        After all of the evidence had been presented and Boyles's attorney had made his closing argument, the Board went into a closed session to deliberate the evidence. Upon returning from

22

closed session, the Board implicitly found that Boyles was disabled for service in the fire department but that his disability was not duty related. The Board denied Boyles's request for a line-of-duty disability pension on that basis and granted Boyles's alternative request for a not-in-duty disability pension instead. A lengthy written order was issued by the Board several months later. In the order, the Board explained its ruling in detail. The Board noted, among other things, that the opinions and conclusions of the relevant doctors (Dr. Ross and the IME doctors) were conflicting and that the Board had ultimately decided to believe the opinions and conclusions of Dr. Sani and Dr. Singh that Boyles's final and permanent back issues were the result of degenerative disease, rather than an act of duty, and that Boyles's September 2021 work injury had resolved by April 2022. The Board cited and discussed several case law decisions, most of which were unpublished, that it felt supported its ruling.

¶ 62       On administrative review, the trial court upheld the Board's decision. Boyles appealed.

¶ 63                                    II. ANALYSIS

¶ 64       On appeal, Boyles argues that the Board erred in finding that Boyles's disability was not the result of an act of duty, in denying his request for a line-of-duty disability pension on that basis, and in awarding him a not-in-duty disability pension instead. In support of that argument, Boyles asserts that the Board's underlying determination, that Boyles's disability was not duty related, was against the manifest weight of the evidence. He argues that in making that determination, the Board ignored portions of the medical records and also ignored the fatal flaws in the opinions of Dr. Sani and Dr. Singh, the two doctors upon whom the Board relied. According to Boyles, the opinion of Dr. Sani was fatally flawed because Sani ignored or failed to read some of the medical records; misstated some of the records; had only limited knowledge of firefighters, their gear, and their activities; made conflicting statements in his deposition

23

testimony; conducted only a brief physical examination of Boyles; and reached conclusions that were not consistent with the facts available. Similarly, Boyles maintains, Dr. Singh's opinion was also fatally flawed because Singh only received a small portion of the medical records, failed to consider some of the records that he had received, made misstatements about those records and about the exams that he had conducted or had failed to conduct, and had a history of being found not to be credible in other proceedings. Thus, Boyles contends that Dr. Sani and Dr. Singh were not credible in the present case and that their opinions should have been disregarded by the Board. In addition, Boyles asserts that the unpublished case law decisions cited by the Board in its written ruling do not support the Board's determination. For all of the reasons stated, therefore, Boyles asks that we reverse the Board's ruling and that we remand this case to the Board with directions to award Boyles a line-of-duty disability pension.

¶ 65    The Board argues that its ruling was proper and should be upheld. The Board asserts that its underlying finding, that Boyles's disability was not duty related, was well supported and was not against the manifest weight of the evidence. In making that assertion, the Board contends that there was a divide in the medical records and in the doctors' opinions as to whether Boyles's disability was caused by an act of duty or by a degenerative condition and that the Board was well within its province to determine which of those two theories of causation was more credible. The Board also contends that Dr. Sani and Dr. Singh provided competent opinions as to Boyles's condition, that the Board was entitled to rely upon those opinions in making its determination, and that Boyles's criticisms of those opinions are not well founded. Perhaps recognizing that unpublished decisions issued before January 1, 2021, should generally not be cited in an appellate brief (Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023)), the Board shies away from those case law decisions that were cited in the Board's written ruling and instead points to published

24

decisions that it claims support its ruling. For all of the reasons set forth, therefore, the Board

asks that we affirm its ruling finding that Boyles's disability was not duty related, denying

Boyles's request for a line-of-duty disability pension on that basis, and awarding Boyles a not-in-

duty disability pension instead.

¶ 66    In cases involving administrative review, the appellate court reviews the decision of the

administrative agency, not the determination of the trial court. *Marconi v. Chicago Heights

Police Pension Board*, 225 Ill. 2d 497, 531 (2006). Judicial review of a decision of a pension

board, such as the one in the present case, is governed by the Administrative Review Law (735

ILCS 5/3-101 *et seq.* (West 2022)) and extends to all questions of fact and law presented by the

entire record. See 40 ILCS 5/4-139 (West 2022); 735 ILCS 5/3-110 (West 2022); *Marconi*, 225

Ill. 2d at 531-32. The standard of review that applies on appeal is determined by whether the

question presented is one of fact, one of law, or a mixed question of fact and law. *Marconi*, 225

Ill. 2d at 532. As to questions of fact, the agency's decision will not be reversed on appeal unless

it is against the manifest weight of the evidence. *Id.* Questions of law, however, are subject to *de

novo* review, and mixed questions of fact and law are reviewed under the clearly erroneous

standard. *Id.* Regardless of which standard of review applies, the plaintiff in an administrative

proceeding bears the burden of proof and will be denied relief if he or she fails to sustain that

burden. *Id.* at 532-33.

¶ 67    The determination of whether a person is entitled to a line-of-duty disability pension is a

question of fact. See *id.* at 534; *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d

485, 505 (2007). Therefore, we will not reverse the Board's decision denying Boyles's

application for a line-of-duty disability pension unless that decision is against the manifest

weight of the evidence. See 735 ILCS 5/3-110 (West 2022) (stating that findings and conclusions

of an administrative agency on questions of fact shall be held to be *prima facie* true and correct); *Marconi*, 225 Ill. 2d at 532-34. For a reversal to be warranted under the manifest weight of the evidence standard, it must be clearly evident from the record that the administrative agency should have reached the opposite conclusion. *Id.* at 534. That the opposite conclusion is reasonable or that the reviewing court might have ruled differently if it were the trier of fact is not enough to justify a reversal. *Id.* Thus, if the record contains some competent evidence to support the agency's decision, the agency's decision should be affirmed. See *id.*; *Roszak v. Kankakee Firefighters' Pension Board*, 376 Ill. App. 3d 130, 138-39 (2007). Furthermore, when examining an administrative agency's factual findings, a reviewing court will not reweigh the evidence presented in the administrative proceeding or substitute its judgment for that of the administrative agency. See *Marconi*, 225 Ill. 2d at 534.

¶ 68     Turning to the merits, we note that the provisions governing the pensions of firefighters must be liberally construed in favor of the applicant. *Roszak*, 376 Ill. App. 3d at 139. For a municipal firefighter to obtain a line-of-duty disability pension, the firefighter must prove that: (1) he is disabled; and (2) his disability was caused by sickness, accident or injury incurred in or resulting from the performance of an act of duty or from the cumulative effects of acts of duty. See 40 ILCS 5/4-110 (cities with 500,000 inhabitants or less), 6-151 (cities with more than 500,000 inhabitants) (West 2022); *Roszak*, 376 Ill. App. 3d at 139. To obtain such benefits, a firefighter need not prove that his duty-related activities were the sole or primary cause of the disability but, rather, must only prove that his duty-related activities were a contributing or exacerbating factor. *Village of Oak Park v. Village of Oak Park Firefighters Pension Board*, 362 Ill. App. 3d 357, 371 (2005). Thus, a line-of-duty disability pension may be awarded based upon

26

the duty-related aggravation of an applicant's preexisting physical condition. *Carrillo v. Park Ridge Firefighters' Pension Fund*, 2014 IL App (1st) 130656, ¶ 23.

¶ 69    In the present case, after reviewing the record and applying the legal principles set forth above, we conclude that the Board's finding—that Boyles's disability was not caused in the line of duty—was against the manifest weight of the evidence. See *Marconi*, 225 Ill. 2d at 534. Simply put, the Board reached a conclusion on causation that none of the doctors who treated Boyles or conducted an IME of Boyles reached. Although the medical records showed that Boyles had a degenerative condition in his spine, not a single doctor opined that Boyles was disabled as a result of that condition. Rather, Dr. Ross (the treating neurosurgeon), Dr. Sampat, and Dr. Hsu all opined that Boyles was disabled and that his disability was the result of an act of duty. Dr. Sani and Dr. Singh, however, opined that Boyles was not disabled and could essentially return to work immediately without restrictions. In fact, Dr. Singh opined that Boyles suffered a soft tissue muscular strain from the incident that had fully resolved. Because Sani and Singh had found that Boyles was not disabled, they did not offer any opinions as to the cause of Boyles's disability. Thus, even setting aside the issue of whether Sani and Singh provided credible opinions, their opinions do not support the Board's determination on the cause of Boyles's disability.

¶ 70    Additionally, it is clear from the Board's oral and written ruling that the Board rejected Sani and Singh's opinions that Boyles was not disabled and actually reached the opposite conclusion when the Board found that Boyles could not return to work and was permanently disabled, a conclusion that was consistent with the opinions of the other three doctors and with the result of the functional capacity examination that had been conducted and about which the parties in this appeal agree. Despite rejecting Sani and Singh's opinions, the Board went on to

27

find that Boyles's permanent disability was caused by a degenerative condition in his lower back, and not by an act of duty, inexplicably pointing to Sani and Singh's opinions as support for that finding. As noted above, Sani and Singh never reached that conclusion. Sani and Singh could not logically give an opinion as to the causation of Boyles's permanent disability when they each opined that he was not disabled and could return to work.

¶ 71 Nor can the Board's conclusion be rationally drawn from the sequence of events that led up to Boyles's current injury as the record before the Board showed that Boyles had worked for the past several years without experiencing a major problem with his lower back (the May 2021 incident was only a minor injury), had responded to numerous calls and performed various physical tasks without incident on the date of the current injury, and had not experienced a problem that day until he tried to help lift the woman on the stretcher and felt a sudden and intense pain in his lower back that radiated down into his left leg. We also note that the record reflects that, with only one exception, every incident that resulted in an injury or problem in Boyles's lower back over the years occurred while he was performing his duties as a firefighter.

¶ 72 Therefore, under the unique facts of the present case, we must conclude that the Board's finding on causation was against the manifest weight of the evidence. Accordingly, we reverse the Board's decision and remand this case to the Board with directions to award Boyles a line-of-duty disability pension.

¶ 73                          III. CONCLUSION

¶ 74 For the foregoing reasons, we reverse the judgment of the circuit court of Will County and the decision of the Board. We remand this case to the Board with the directions to award Boyles a line-of-duty disability pension.

28

¶ 75        Circuit court judgment reversed.
Board decision reversed, (Administrative review)
Cause remanded to Board with directions.